IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVETTE GBALAZEH, LEE SUNBURY, and FRED SIMS, on behalf of themselves and all others similarly situated, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIV. CASE NO. 3:18-cv-00076-N |
| CITY OF DALLAS, TEXAS, a municipality of the State of Texas, | § § § | |
| Defendant. | § § | <u>JURY TRIAL DEMANDED</u> |

**APPENDIX TO PLAINTIFFS' MOTION TO SUMMARY JUDGMENT**

COME NOW, Plaintiffs YVETTE GBALAZEH, LEE SUNBURY, and FRED SIMS on

behalf of themselves and all others similarly situated (collectively, "**Plaintiffs**"), file this Appendix

to Plaintiffs' Third Amended Complaint and Application for Preliminary Injunction (this

"**Appendix**"):

> **EXHIBIT 1** – Elizabeth Findell, *Dallas Council Members Call for Panhandling Crackdown*, DALLAS MORNING NEWS, Nov. 10, 2014, https://www.dallasnews.com/news/news/2014/11/10/dallas-council-members-call-for-panhandling-crackdown (last visited Aug. 20, 2018).

> **EXHIBIT 2** – Robert Wilonsky and Tristan Hallman, *Dallas' Homeless Problem Grew While City Officials Took Eye Off the Ball, Audit Claims*, DALLAS MORNING NEWS, Dec. 11, 2017, https://www.dallasnews.com/news/dallas-city-hall/2017/12/11/dallas-homeless-problem-grew-city-officials-took-eye-ball-audit-claims (last visited Aug. 20, 2018).

> **EXHIBIT 3** – Tasha Tsiaperas, *How Many Homeless Live on Streets? The Number Jumped 23% This Year*, Dallas Morning News, Mar. 21, 2018, https://www.dallasnews.com/news/social-justice-1/2018/03/21/homelessness-rise-living-dallas-streets-not-shelters-really-spiked (last visited Aug. 20, 2018).

> **EXHIBIT 4** – Section 31-35 of the Code of Ordinances of the City of Dallas, Texas (the "**Free Speech Ban**" also known as the "**Panhandling Ordinance**")

**EXHIBIT 5** – Section 28-63.3 of the Code of Ordinances of the City of Dallas, Texas (the "**Vehicle Panhandling Ordinance**")

**EXHIBIT 6** – Eric Nicholson, *Federal Judge: Dallas Ministries Can Feed the Homeless Wherever They Damn Well Please*, DALLAS OBSERVER, Mar. 29, 2013, http://www.dallasobserver.com/news/federal-judge-dallas-ministries-can-feed-the-homeless-wherever-they-damn-well-please-7135775 (last visited Aug. 20, 2018).

**EXHIBIT 7** – Eric Nicholson, *Dallas Police Are Now Rounding Up Homeless People for "Sleeping in Public" Downtown*, DALLAS OBSERVER, Feb. 5, 2014, https://www.dallasobserver.com/news/dallas-police-are-now-rounding-up-homeless-people-for-sleeping-in-public-downtown-7121564 (last visited Aug. 20, 2018)

**EXHIBIT 8** – Eric Nicholson, *Local Software Engineer Threatened with Ticket for Meditating Downtown*, DALLAS OBSERVER, Apr. 28, 2016, http://www.dallasobserver.com/news/local-software-engineer-threatened-with-ticket-for-meditating-downtown-8251093 (last visited Aug. 20, 2018).

**EXHIBIT 9** – Robert Wilonsky, *Woman Who 'Will Rap 4 Weed' Sues Dallas Over Panhandling Ordinance It Can't Enforce*, DALLAS MORNING NEWS, Jan. 18, 2018, https://www.dallasnews.com/opinion/commentary/2018/01/18/woman-will-rap-4-weed-sues-dallas-panhandling-ordinance-cant-enforce (last visited Aug. 20, 2018).

**EXHIBIT 10** – Stephen Young, *Despite Changes, Dallas Panhandling Enforcement Still Probably Illegal*, DALLAS OBSERVER, Jan. 5, 2018, http://www.dallasobserver.com/news/dallas-on-shakey-legal-ground-with-panhandling-bans-10228403 (last visited Aug. 20, 2018).

**EXHIBIT 11** – Eric Nicholson, *Dallas Is Probably Screwed If It Gets Sued over New Panhandling Crackdown*, DALLAS OBSERVER, Feb. 3, 2016, *http://www.dallasobserver.com/news/dallas-is-probably-screwed-if-it-gets-sued-over-new-panhandling-crackdown-7990354* (last visited Aug. 20, 2018)

**EXHIBIT 12** – Stephen Young, *Dallas' Panhandling Situation Isn't Nearly as Complicated as the Police Chief Makes it Sound*, DALLAS OBSERVER, Jan. 9, 2018, http://www.dallasobserver.com/news/dallas-panhandling-policy-update-its-ok-to-beg-mostly-10239378 (last visited Aug. 20, 2018).

**EXHIBIT 13** – Unsworn Declaration of Yvette Gbalazeh

**EXHIBIT 14** – Craig Hlavaty, *'Will Rap 4 Weed' Sign is a Political Statement, Not a Request*, HOUSTON CHRONICLE, Sept. 3, 2013, http://blog.chron.com/thetexican/2013/09/will-rap-4-weed-sign-is-a-political-statement-not-a-request/ (last visited Aug. 20, 2018).

**EXHIBIT 15** – *Houston's 43 Most Fascinating People*, HOUSTON CHRONICLE, http://www.chron.com/life/ slideshow/Houston-s-43-most-fascinating-people-75322/photo-5550408.php (last visited Aug. 20, 2018).

**EXHIBIT 16** – Amber Joseph, *Weed Activist Running for Texas Governor to Re-Legalize*, CROSSROADS TODAY NEWSCENTER, December 7, 2017, http://www.crossroadstoday.com/story/37016934/ weed-activist-running-for-texas-governor-to-re-legalize (last visited Aug. 20, 2018).

**EXHIBIT 17** – Unsworn Declaration of Lee Sunbury

**EXHIBIT 18** – Unsworn Declaration of Fred Simms

**EXHIBIT 19**– Dallas Police Department Roll Call Training Bulletin #2018-03

Dated: August 26, 2019.

Respectfully submitted,

**MURPHY RODRIGUEZ, PLLC**
3300 Oak Lawn Ave. Suite 408
Dallas, Texas 75219
P: 972-752-0557
F: 972-692-7719
Ramon@gotexlaw.com
Murphy@gotexlaw.com

By: */s/Ramon de Jesus Rodriguez*
Ramon de Jesus Rodriguez
State Bar No. 24088319
**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on August 26, 2019 a true and correct copy of the foregoing application and supporting documents were served on Defendant's counsel of record via ECF in accordance Federal Rules of Civil Procedure.

Sonia Ahmed, sonia.ahmed@dallascityhall.com
Justin Roy, justin.roy@dallascityhall.com
Kathleen Fones, kathleen.fones@dallascityhall.com
Dallas City Attorney's Office
1500 Marilla Street #7DN Dallas, TX 75201

By: */s/Ramon de Jesus Rodriguez*
Ramon de Jesus Rodriguez

# Exhibit 1





☰ **ALL SECTIONS**                          SUBSCRIBE

**NEWS**    **NOV 2014**

# Dallas council members call for panhandling crackdown

 *Elizabeth Findell*

Don't miss a story. Like us on Facebook.      **LIKE DALLAS NEWS**

Some Dallas City Council members are fed up with panhandlers and want the Dallas Police Department to crack down on them — even if other crimes take higher priority.

"Break their backs, break their spirit — that's the only way we're going to win this battle," council member Rick Callahan said Monday during a meeting of the Quality of Life Committee.

Callahan called panhandlers "nonconformists" and compared them setting down belongings to dogs urinating on cars.

He said "I don't care" if officers said they had more serious crimes to address. "This is affecting the shopping and the well-being of my area."

Callahan said he wants panhandlers ticketed and jailed as many times as it takes to make them leave.

During a panhandling presentation to the committee, Callahan and others emphasized how problematic they found it and asked police for tougher enforcement.

"One guy, he even raises his fist at me," Callahan said. " 'Cause he knows my vehicle and he hollers and says, 'You'll never drive me off,'" he said. "I like to think, 'Oh, yes we can.' "

The city's panhandling ordinance was updated in 2011 to outlaw the practice in downtown, Uptown, Deep Ellum and Victory Park. Elsewhere, solicitation is banned after dark. Committee members said they had seen improvements, but too little enforcement overall.

Police said they have issued 155 panhandling citations and arrested 39 people in the last six months.

Committee member Carolyn Davis voiced concern about persistence of begging in certain motorways but expressed some compassion, mentioning a schoolmate who is homeless now — just as he was in first grade, she said.

Davis questioned whether the role of health and human services in the city was as strong as it once was.

"I'm not going to beat up on the homeless that bad," she said. "We used to have something to guide them."

Committee chair Dwaine Caraway suggested police develop a specific panhandler unit and said he might support making the ordinance stronger.

○ VIEW COMMENTS



One of the best concerts of the year just came to Dallas — and you may not...

‹ Prev                                          Next ›

# OPINION

⟳ LOADING...

About Us                                      FAQ

Careers                                       Privacy Policy

Advertise                                     Terms of Service

Contact Us                                    Site Map

Special Sections

©2018, The Dallas Morning News Inc. All Rights Reserved.

# Exhibit 2

8/21/2018              Dallas' homeless problem grew while city officials took eye off the ball, audit claims | Dallas City Hall | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 10 of 114   PageID 1514





☰ **ALL SECTIONS**                                       SUBSCRIBE

**DALLAS CITY HALL**    **DEC 11**

# Dallas' homeless problem grew while city officials took eye off the ball, audit claims

 *Robert Wilonsky and Tristan Hallman*

*Don't miss a story. Like us on Facebook.*        LIKE DALLAS NEWS

Dallas City Hall has done a poor job keeping an eye on the people and agencies it has tasked with helping the homeless, an internal audit concluded Monday. And the city has little, if any idea, who is being helped and how.

Because of a lack of city oversight of the nonprofit Metro Dallas Homeless Alliance, which has been spearheading Dallas' homeless-relief efforts for more than a decade, millions of dollars have probably been left on the table that could have gone toward sheltering the unsheltered, says the audit — the most scathing account of Dallas' struggle to address a growing homeless population.

Top city officials said the audit only confirmed what they already knew. After all, homeless encampments are ubiquitous, disparate relief efforts pop up here and there, and looking for better

8/21/2018        Dallas' homeless problem grew while city officials took eye off the ball, audit claims | Dallas City Hall | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 11 of 114   PageID 1515

data to help clean up the mess is often fruitless. Officials said they are already implementing changes and now have the proof they need to push forward.

Nadia Chandler-Hardy, the city's chief of community services, said the city needed "an overhaul across the board." The audit, she said, "just kind of solidifies things to me. Now I feel like I really got the baton and I can run."

City auditor Craig Kinton's lengthy report, sent to the City Council Friday night, said MDHA's recently implemented centralized database, called a Homeless Management Information System, is incomplete and failed to take into account the varying needs of the homeless service providers, chief among them The Bridge downtown, which serves some 7,000 people annually.

Tent City closed, so where do Dallas' homeless go from here?

As a result, says the audit, The Bridge was "pushed to the brink," and twice in 2017 flirted with having to close its doors after the city withheld $4 million in funding due to incomplete documentation, which the report says The Bridge was trying to fill out "in good faith."

Even "a temporary closure would damage the city's homeless response system," says the audit.

The city has already seen, since 2013, its unsheltered population quadruple to 1,087. Meanwhile, the city's homeless population, which stands at 3,789, increased by only about 600 people in that time.

Sam Merten, The Bridge's chief operating officer, said in a statement Monday that he was pleased that the audit showed how "HMIS-related issues beyond our control" risked harming the city's services.

Number of homeless people living on the streets of Dallas, Collin counties is up drastically

A renewal for an interlocal agreement with The Bridge — a frequent punching bag for some City Council members and downtown-area residents who believe it's a lousy neighbor — is scheduled for a council vote Wednesday. The council will also vote to deposit $1 million in funds from Dallas County earmarked for homeless assistance services.

8/21/2018 Dallas' homeless problem grew while city officials took eye off the ball, audit claims | Dallas City Hall | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 12 of 114   PageID 1516

Photo Gallery    1/13



(Irwin Thompson/Staff Photogr

The agreement with The Bridge includes more demands from the city, such as a "good neighbor provision" and more contract monitoring. City officials also want the nonprofit to rely more on nongovernmental funding. Chandler-Hardy, who joined the city earlier this year, said leaders took their eye off the ball for a few years and "things fell through the cracks."

"As we tighten up things around here and run a tighter ship, we also want to make sure our partners are doing the same," Chandler-Hardy said.

[Dallas closes another homeless encampment near Fair Park](#)

Merten said The Bridge is "working closely with the city" to resolve any issues.

"And we look forward to continuing to provide top-notch recovery services to citizens experiencing homelessness in our community," he said.

Council member Mark Clayton, who co-chairs a new regional homelessness services partnership, said he feels the newfound attention on the issue is positive.

One consistent theme is a lack of data, he said. Kinton's audit notes that the HMIS database covers just 30 percent of all the beds being utilized by the service providers to whom the city has historically outsourced its homeless care. As a result, the audit says, Dallas is near the very bottom of the list of 402 cities contributing to the National Homeless Information Project , which shares best practices aimed at housing, feeding, clothing and employing the homeless.

The audit is critical of the database, which was created by a company that had never before done such work, and the way it was implemented by MDHA. The report says the way MDHA used the database "did not meet the needs" of the city's five largest homeless service providers: The Bridge, the Union Gospel Mission, Dallas Life, the Austin Street Shelter and the Salvation Army.

Homeless live by a code in I-45 'Tent City,' but Dallas wants them cleared out

The audit also raises concerns with the way MDHA's board went about selecting the vendor — without going through competitive bidding procedures. As a result, says the audit, MDHA "violated federal procurement requirements and could result in the loss of the HMIS' federal funding."

At the time, there was but one Dallas official on the MDHA board: Bernadette Mitchell, at the time the head of Dallas Housing and Community Services. That department came under fire in a 2016 audit that said Kinton's staff couldn't find paperwork documenting how developers spent $29.9 million intended for affordable housing.

Via email, MDHA president and CEO Cindy Crain said that her board received the audit Sunday, and that it will be reviewed for a full response at its next meeting in mid-January.

But Kinton and his staff also blame the city for the situation: "During implementation period, the city's oversight of MDHA was inadequate."

City Manager T.C. Broadnax called the audit "a starting point."

Case 3:18-cv-00076-N    Document 97    Filed 08/26/19    Page 14 of 114    PageID 1518

"And we have already begun to reset the deck with expectations and accountability of staff as well as our providers," Broadnax said.

The need for accountability is a staple of Kinton's audits in recent years. And Broadnax said enough is enough.

"From my understanding of previous audits, and not just in the homeless area, it's clear we don't always cross our t's and dot our i's and our policies and processes are sometimes lacking," he said. "I look forward to implementing the things that were recommended and we agreed to and working more closely with our providers and our own internal departments to do a better job at how we deal with homelessness in this community."

[Audit of Homeless Response System Effectiveness 12-08-2017](#) by [Tristan Hallman](#) on Scribd



**Memorandum**

CITY OF DALLAS

DATE:   December 8, 2017

TO:   Honorable Mayor and Members of the City Council

SUBJECT:   Final Report –
Audit of Homeless Response System Effectiveness

The City of Dallas (City) cannot tell how well the homeless response system is performing and needs to improve: (1) oversight of the Metro Dallas Homeless Alliance (MDHA) and The Bridge; and, (2) how the City evaluates, coordinates, and monitors homeless services. The homeless response system is the coordinated government and community effort to resolve, prevent, and end homelessness in the area (City of Dallas, Dallas County, Collin County, and the City of Irving).

The objective of the audit was to assess the efficiency and effectiveness of the City's homeless response system, which included an evaluation of the contracting procedures for homeless services, including how contracted services meet assessed needs and are monitored for quality performance. The audit scope covered management operations from FY 2015 through FY 2016; however, certain other matters, procedures, and transactions outside the scope were reviewed to understand and verify information during the audit period.

We appreciate the cooperation we received from City management during the conduct of this audit. If you have any questions, please call me at 214-670-3222 or Carol A. Smith, First Assistant City Auditor, at 214-670-4517.

Sincerely,

Craig D. Kinton
City Auditor

Attachment

C:   T.C. Broadnax, City Manager
Nadia Chandler-Hardy, Chief of Community Services
Charletra Sharp, Interim Managing Director – Office of Homeless Services
Kimberly B. Tolbert, Chief of Staff
Cheritta Johnson, Interim Director – Office of Community Care
Jack Ireland, Director – Office of Budget
Larry Casto, City Attorney
Barbara Martinez, Executive Assistant City Attorney

"Dallas, the City that Works:  Diverse, Vibrant, and Progressive."

**Correction, 9:45 a.m., Dec. 12, 2017:** *This story has been revised to reflect that Nadia Chandler-Hardy was hired earlier this year, not last year.*

IN THIS COLLECTION...

## Everything you need to know about Dallas' homeless crisis

How tiny houses and shipping containers just might solve the Dallas homeless crisis

New leaders must tackle rising Dallas homelessness amid growing problems

How many homeless live on streets? The number jumped 23% this year

*See all 33 Stories* →

◯ VIEW COMMENTS

DALLAS CITY HALL  DALLAS  DALLAS CITY COUNCIL  NEWS  LOCAL POLITICS



↻ LOADING...

About Us

Careers

Advertise

Contact Us

Special Sections

Al Día (En Español)

FAQ

Privacy Policy

Terms of Service

Site Map

*©2018, The Dallas Morning News Inc. All Rights Reserved.*

# Exhibit 3

5/14/2018    How many homeless live on streets? The number jumped 23% this year | Social Justice | Dallas News

Case 3:18-cv-00076-N    Document 97    Filed 08/26/19    Page 18 of 114    PageID 1522



SOCIAL JUSTICE    MAR 22

# How many homeless live on streets? The number jumped 23% this year

 *Tasha Tsiaperas, Staff Writer*

*Don't miss a story. Like us on Facebook.*        LIKE DALLAS NEWS

The number of homeless people in Dallas and Collin counties has increased again, up 9 percent from last year, according to data released Wednesday from the annual homeless census.

There were 4,140 homeless people counted in the two counties on one night in January, up from 3,789 counted last year. There was also a 23 percent increase in the unsheltered, those who don't seek housing in shelters and live on the streets.

Tarrant County saw a similar increase, up almost 5 percent from 1,924 homeless people counted in 2017 to 2,015 people counted in 2018.

[For homeless to coexist in a booming downtown Dallas, new Stewpot chief must be a 'connector'](#)

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 19 of 114   PageID 1523

The increase in overall homelessness reflects a national trend. And the number of people living on the street across the country increased 9 percent last year compared with 2016, according to an annual report from the U.S. Department of Housing and Urban Development.

"It's not something unique about Dallas. There's something systemic in the U.S. that's feeding this increase," said Cindy Crain, president and CEO of the Metro Dallas Homeless Alliance.

The group conducts the federally required point-in-time census, which tracks trends in homelessness each year.

Photo Gallery    |    1/5



(Ron Baselice/Staff Ph

## Chronic homelessness down

On top of the rise in overall homelessness, there were more Dallas and Collin County residents experiencing homelessness for the first time counted this year: 277, compared with 208 in 2017.

But the number of people who are chronically homeless — meaning they've been on the streets more than a year or have experienced homelessness several time in a few years — has been steadily decreasing the past three years.

This year, 424 people were found to be chronically homeless. In 2016, there were 597 chronically homeless people counted.

Crain said that's probably due to a focus on housing chronically homeless people.

## Homelessness in Dallas, Collin counties

Total homelessness in Dallas and Collin counties has steadily increased.

## Mostly men — and aging

For the past two years, MDHA has gotten more volunteers to count homeless people during the annual census. That's helped get a more accurate point-in-time look of homelessness in the area.

This year, there were 1,341 unsheltered homeless people counted in the census, up from 1,087 in 2017.

The vast majority of those on the street live in Dallas; only 116 were counted in Collin County. And nearly 80 percent of the total in Dallas and Collin counties are men.

That population is also aging. About 700 of those living outside are over 45.

"How do we let our elderly fall into homelessness?" Crain asked during her presentation Wednesday.

5/14/2018 How many homeless live on streets? The number jumped 23% this year | Social Justice | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 21 of 114   PageID 1525

# Kids without families

There were 662 children counted in the census this year. A vast majority of those kids live in emergency shelters or transitional housing with their families.

But there were 64 youths living in an emergency shelter without a relative.

'Youth are hiding' among homeless in Dallas, but city will seek them out

This year volunteers went out seeking children living on the street. About 3,000 kids and teens in the school system are considered homeless, but social workers believe far fewer actually live on the street.

But there is no count. The annual census easily tracked the number living in shelters. Many teens living on the streets avoid calling attention to themselves.

Nearly 41,000 unaccompanied homeless youth were counted nationwide in 2017, according to HUD's report. Nearly 90 percent of those youth were between the ages of 18 and 24.

The local survey of homeless youth will be released April 19.

$50,000 Pegasus Prize boosts center to help homeless youths in Dallas

IN THIS COLLECTION...

## Everything you need to know about Dallas' homeless crisis

**How tiny houses and shipping containers just might solve the Dallas homeless crisis**

5/14/2018      How many homeless live on streets? The number jumped 23% this year | Social Justice | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 22 of 114   PageID 1526

**New leaders must tackle rising Dallas homelessness amid growing problems**

**$50,000 Pegasus Prize boosts center to help homeless youths in Dallas**

*See all 33 Stories →*

○ VIEW COMMENTS

**SOCIAL JUSTICE**     **DALLAS COUNTY**     **COLLIN COUNTY**



5/14/2018 How many homeless live on streets? The number jumped 23% this year | Social Justice | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 23 of 114   PageID 1527

One of the best concerts of the year just came to Dallas — and you may not...

‹ Prev                                                                    Next ›

# OPINION

| LOADING... |
| --- |

About Us                              FAQ

Careers                               Privacy Policy

Advertise                             Terms of Service

Contact Us                            Site Map

Special Sections

©2018, The Dallas Morning News Inc. All Rights Reserved.

Exhibit
4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVETTE GBALAZEH, LEE SUNBURY, and FRED SIMS, on behalf of themselves and all others similarly situated, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIV. CASE NO. 3:18-cv-00076-N |
| CITY OF DALLAS, TEXAS, a municipality of the State of Texas, | § § § | |
| Defendant. | § | <u>JURY TRIAL DEMANDED</u> |

<u>EXHIBIT 4</u>

<u>CITY OF DALLAS, TEXAS</u>
<u>CODE OF ORDINANCES</u>

**SEC. 31-35.  SOLICITATION BY COERCION; SOLICITATION NEAR DESIGNATED LOCATIONS AND FACILITIES; SOLICITATION AFTER SUNSET; SOLICITATION-FREE ZONES.**

(a)   In this section:

    (1)   AUTOMATED TELLER MACHINE means a machine, other than a telephone:

        (A)   that is capable of being operated by a customer of a financial institution;

        (B)   by which the customer may communicate to the financial institution a request to withdraw a benefit for the customer or for another person directly from the customer's account or from the customer's account under a line of credit previously authorized by the financial institution for the customer; and

        (C)   the use of which may or may not involve personnel of a financial institution.

    (2)   CENTRAL BUSINESS DISTRICT SOLICITATION-FREE ZONE means the area of the city bounded by Woodall Rodgers Freeway on the north, Central Expressway (elevated bypass) on the east, R. L. Thornton Freeway on the south, and Stemmons Freeway on the west.

(3)     COERCION means:

    (A)     to approach or speak to a person in such a manner as would cause a reasonable person to believe that the person is being threatened with:

        (i)     imminent bodily injury; or

        (ii)     the commission of a criminal act upon the person or another person, or upon property in the person's immediate possession;

    (B)     to persist in a solicitation after the person solicited has given a negative response;

    (C)     to block, either individually or as part of a group of persons, the passage of a solicited person; or

    (D)     to engage in conduct that would reasonably be construed as intended to compel or force a solicited person to accede to demands.

(4)     DEEP ELLUM SOLICITATION-FREE ZONE means the area bounded by and including the following streets or portions of streets:

| STREET | EXTENT |
|---|---|
| Good-Latimer Expressway | Elm Street to Canton Street |
| Canton Street | Good-Latimer Expressway to Hall Street |
| Hall Street | Canton Street to Elm Street |
| Elm Street | Hall Street to Good-Latimer Expressway |

(5)     EXTERIOR PUBLIC PAY TELEPHONE means any coin or credit card reader telephone that is:

    (A)     installed or located anywhere on a premises except exclusively in the interior of a building located on the premises; and

    (B)     accessible and available for use by members of the general public.

(6)     FIXED FOOD ESTABLISHMENT means a food establishment, as defined in Section 17-1.5 of this code, that is operated from a fixed facility.

(7)     PUBLIC TRANSPORTATION STOP means an area officially marked and designated as a place to wait for a bus, a light rail vehicle, or any other public transportation vehicle that is operated on a scheduled route with passengers paying fares on an individual basis.

(8)     SELF-SERVICE CAR WASH means a structure:

    (A)     at which a vehicle may be manually washed by its owner or operator with equipment that is activated by the deposit of money in a coin-operated machine; and

    (B)     that is accessible and available for use by members of the general public.

(9)     SELF-SERVICE FUEL PUMP means a fuel pump:

    (A)     from which a vehicle may be manually filled with gasoline or other fuel directly by its owner or operator, without the aid of an employee or attendant of the premises at which the fuel pump is located; and

    (B)     that is accessible and available for use by members of the general public.

(10)     SOLICITATION means to ask, beg, solicit, or plead, whether orally or in a written or printed manner, for the purpose of receiving contributions, alms, charity, or gifts of items of value for oneself or another person.

(11)     SUNRISE means the time of day published on the weather page of the *Dallas Morning News* as the time for sunrise on a particular day in the city.

(12)     SUNSET means the time of day published on the weather page of the *Dallas Morning News* as the time for sunset on a particular day in the city.

(13)     UPTOWN SOLICITATION-FREE ZONE means the area bounded by and including the following streets or portions of streets:

| STREET | EXTENT |
| --- | --- |
| Akard Street | Woodall Rogers Freeway to Cedar Springs Road |
| Cedar Springs Road | Akard Street to McKinnon Street |
| McKinnon Street | Cedar Springs Road to the Katy Trail |
| Katy Trail | McKinnon Street to Cambrick Street |
| Cambrick Street | Katy Trail to Central Expressway |
| Central Expressway | Cambrick Street to Woodall Rogers Freeway |
| Woodall Rogers Freeway | Central Expressway to Akard Street |

(14)   VICTORY SOLICITATION-FREE ZONE means the area bounded by and including the following streets or portions of streets:

| STREET | EXTENT |
| --- | --- |
| Harry Hines Boulevard | Dallas North Tollway to N. Field Street |
| N. Field Street | Harry Hines Boulevard to Caroline Street |
| Caroline Street | N. Field Street to Woodall Rogers Freeway |
| Woodall Rogers Freeway | Caroline Street to Stemmons Freeway |
| Stemmons Freeway | Woodall Rogers Freeway to the Dallas North Tollway |
| Dallas North Tollway | Stemmons Freeway to Harry Hines Boulevard |

(b)   A person commits an offense if he conducts a solicitation by coercion.

(c)   A person commits an offense if he conducts a solicitation in any outdoor area in the city at any time between sunset and sunrise on any day of the week. It is a defense to prosecution under this subsection if the solicitation:

(1)   consisted exclusively of passive, nonverbal acts; or

(2)   was being conducted on property with the advance written permission of the owner, manager, or other person in control of the property.

(d)   Solicitation-free zones.

(1)   A person commits an offense if he conducts a solicitation at any time in any outdoor area located within any of the following solicitation-free zones:

(A)   Central Business District solicitation-free zone.
(B)   Deep Ellum solicitation-free zone.
(C)   Uptown solicitation-free zone.
(D)   Victory solicitation-free zone.

(2)   It is a defense to prosecution under this subsection if the solicitation was being conducted on property with the advance written permission of the owner, manager, or other person in control of the property.

(e)   A person commits an offense if he conducts a solicitation to any person placing or preparing to place money in a parking meter.

(f)   A person commits an offense if he conducts any solicitation within 25 feet of:

(1)   an automated teller machine;
(2)   an entrance or exit of a bank, credit union, or other similar financial institution;

4

(3)     an exterior public pay telephone;
(4)     a self-service car wash;
(5)     a self-service fuel pump;
(6)     a public transportation stop; or
(7)     an outdoor dining area of a fixed food establishment.

(g)     For purposes of Subsection (f), measurement will be made in a straight line, without regard to intervening structures or objects, from the nearest point at which a solicitation is being conducted to whichever is applicable of the following:

(1)     the nearest entrance or exit of a facility in which an automated teller machine is enclosed or, if the machine is not enclosed in a facility, to the nearest part of the automated teller machine;

(2)     the nearest entrance or exit of a bank, credit union, or other similar financial institution;

(3)     the nearest part of an exterior public pay telephone;

(4)     the nearest part of the structure of a self- service car wash;

(5)     the nearest part of a self-service fuel pump;

(6)     the nearest point of any sign or marking designating an area as a public transportation stop; or

(7)     the nearest part of any table in an outdoor dining area or, if the outdoor dining area is contained within an enclosure, the nearest part of that enclosure.

(h)     In addition to any enforcement action by a peace officer for a violation of this section, any person who is a victim of a solicitation prohibited under Subsection (b), (c), (d), (e), or (f), or who witnesses a violation of Subsection (c), (d), (e), or (f), may file a complaint with the city attorney. Evidence to support a conviction for a violation of this section may include, but is not limited to, testimony of witnesses, videotape evidence of the violation, and other admissible evidence.

(i)     An offense under this section is punishable by a fine not to exceed $500.  (Ord. Nos. 21030; 25213; 26738; 28075).

Exhibit
5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVETTE GBALAZEH, LEE SUNBURY, and FRED SIMS, on behalf of themselves and all others similarly situated, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIV. CASE NO. 3:18-cv-00076-N |
| CITY OF DALLAS, TEXAS, a municipality of the State of Texas, | § § § | |
| Defendant. | § | JURY TRIAL DEMANDED |

<u>EXHIBIT 5</u>

<u>CITY OF DALLAS, TEXAS
CODE OF ORDINANCES</u>

## SEC. 28-63.3. SOLICITATION TO OCCUPANTS OF VEHICLES ON PUBLIC ROADWAYS PROHIBITED.

(a)  In this section:

(1)  GOODS means property of every kind.

(2)  PUBLIC PROPERTY means:

(A)  any property open or devoted to public use or owned by the city; and

(B)  any area dedicated to the public use for sidewalk, street, highway, or other transportation purposes, including, but not limited to, any curb, median, parkway, shoulder, sidewalk, alley, drive, or public right-of-way.

(3)  ROADWAY has the meaning given that term in Chapter 541, Texas Transportation Code.

(4)  SERVICES means any work done for the benefit of another person.

(5)  SOLICITATION means any conduct or act whereby a person:

(A)    either orally or in writing, asks for a ride, employment, goods, services, financial aid, monetary gifts, or any article representing monetary value, for any purpose;

(B)    either orally or in writing, sells or offers for sale goods, services, or publications;

(C)    distributes without remuneration goods, services, or publications; or

(D)    solicits signatures on a petition or opinions for a survey.

(6)    VEHICLE has the meaning given that term in Chapter 541, Texas Transportation Code.

(b)    A person commits an offense if, while occupying any public property adjacent to any public roadway in the city, he knowingly conducts a solicitation directed to, or intended to attract the attention of, the occupant of any vehicle stopped or traveling on the roadway.  An offense occurs when the solicitation is made, whether or not an actual employment relationship is created, a transaction is completed, or an exchange of money, goods, or services takes place.

(c)    It is a defense to prosecution under Subsection (b) that the person was:

(1)    summoning aid or requesting assistance in an emergency situation; or

(2)    a law enforcement officer in the performance of official duties.

(d)    In addition to any enforcement action by a peace officer for a violation of this section, any person who is a victim of a solicitation prohibited under Subsection (b), or who witnesses a violation of Subsection (b), may file a complaint with the city attorney. Evidence to support a conviction for a violation of this section may include, but is not limited to, testimony of witnesses, videotape evidence of the violation, and other admissible evidence.  (Ord. 25213).

Exhibit
6

5/14/2018

Federal Judge: Dallas Ministries Can Feed the Homeless Wherever They Damn Well Please | Dallas Observer

1/3

**Vanguard®**

# Federal Judge: Dallas Ministries Can Feed the Homeless Wherever They Damn Well Please

**ERIC NICHOLSON** | **MARCH 29, 2013** | **7:00AM**



It's been eight years since the Dallas City Council passed its homeless feeding ordinance, which barred charity groups from serving food except at certain designated sites. And it's been just more than six years since two of those groups, Big Heart Ministries



observer

Federal Judge: Dallas Ministries Can Feed the Homeless Wherever They Damn Well Please | Dallas Observer

and Rip Parker Memorial Homeless Ministry, sued the city in federal court over the ban.

The case ended today in a victory for the homeless and those who feed them. As the *Morning News* first reported, U.S. District Judge Jorge Solis ruled that the city's ordinance amounts to a violation of Big Heart's and Rip Parker Memorial's rights under the Texas Religious Freedom Restoration Act, which bars state and local government from doing anything that might "substantially burden a person's free exercise of religion."

But the victory is a narrow one. The city's homeless feeding ordinance remains intact, except where it concerns the plaintiffs and, by extension, other groups who feel a religious duty to serve the underfed. Those of you who simply feel sorry for the unhoused, without the backing of religious conviction? Drop those plans to hand out sandwiches on a street corner. You're better off just volunteering at The Stewpot, unless, of course, you enjoy six-year legal battles.

"I'm totally blessed," Big Heart founder Don Hart told CBS 11. "It's been a great, great, great victory." He plans to resurrect his ministry on Easter Sunday.

RELATED TOPICS:     NEWS     CITY HALL     COURTS

Federal Judge: Dallas Ministries Can Feed the Homeless Wherever They Damn Well Please | Dallas Observer

©2018 Dallas Observer, LP. All rights reserved.

# Exhibit 7

White
Standing…
$349



**Courtesy of Tanya Ragan**

A group of homeless people bedding down for the night on a street near The Bridge.

# Dallas Police Are Now Rounding Up Homeless People for "Sleeping in Public" Downtown

**ERIC NICHOLSON** | **FEBRUARY 5, 2014** | **7:00AM**

Dallas has never been able to clear the homeless from downtown streets, though not for lack of trying. Bans on panhandling, feeding homeless people, library benches and sleeping in public have provided city officials with helpful tools, but they have proved inadequate.

Or perhaps it's just that because they weren't being deployed with sufficient bluntness.

In November, Dallas police began daily, early-morning sweeps of the Central Business District, arresting people caught sleeping on sidewalks, benches, stoops. They are loaded into a paddy wagon and taken to Lew Sterrett. (Note: Following the story, Dallas Police Chief David Brown tweeted that DPD will review the practice.)

*See also: Dwaine Caraway Says Dallas is the "Homeless Capital of the World" and Should Bus Them Out of Town*

"A lot of people around downtown, especially in the Farmers Market area, were complaining that, in the morning, they'd find people sleeping on their steps and [in front of] different businesses," says Larry Litton, a sergeant in DPD's Central Business District

unit.

Before, when officers would find people sleeping, they might write them a ticket, which would inevitably go unpaid. If that person kept showing up at the same spot, there might be an arrest. The new approach is more effective, Litton says, since it "gives them more incentive to comply with the law."

Litton says the numbers bear this out. Since the paddy wagon got rolling in November, Litton has seen a steady decline in the number of arrests.

"We're not taking any more enforcement action," he says. "It's just that we're not writing tickets."

Tanya Ragan, president of the Farmers Market Stakeholders Association, contends that DPD's early-morning sweeps are an attempt to cope with fallout from a policy change at The Bridge homeless shelter.

"The Bridge used to let police sign in every homeless person that showed up," she writes in an email. "Now police are only allowed 7 per night unless the temp drops below 37."

That has had the predictable effect of increasing the number of people camping out in front of nearby homes and businesses.

"At [FMSA]'s last crime watch meeting The Bridge security director flat out told the group that they wouldn't allow homeless on their property at night," Ragan writes. "They either had to come inside by 7pm or get kicked off the Bridge property."

An official with The Bridge has not yet responded to a request for comment but an independent source confirms the facility has drastically cut down on the number of

individuals police are allowed to bring in at night.

*See also: Federal Judge: Dallas Ministries Can Feed the Homeless Wherever They Damn Well Please*

The sleeping-in-public ban has been around long enough that's it's not often discussed, but it was controversial when it was implemented in the early 1990s and sparked a class action lawsuit by Dallas' homeless. They scored an initial victory in 1994, when a federal judge forbade Dallas police from enforcing the ban, reasoning that, because shelter space is limited, and because human beings need sleep, the measure amounted to cruel and unusual punishment.

The decision was reversed on appeal, although not because the U.S. Court of Appeals for the Fifth Circuit found the measure constitutional. Since none of the tickets or arrests made under the law ever led to convictions, the homeless plaintiffs didn't have standing to bring their case.

In other words, Dallas is free to arrest people for sleeping in public all it wants so long as it doesn't actually prosecute them. Which is what appears to happening every morning downtown.

*Send your story tips to the author, Eric Nicholson.*

RELATED TOPICS:    NEWS     CRIME

Dallas Police Are Now Rounding Up Homeless People for "Sleeping in Public" Downtown | Dallas Observer

©2018 Dallas Observer, LP. All rights reserved.

5/14/2018

5/5

Exhibit
8

**server**

Info

Ergonomic Office Chair. Red Apple Color.

$319

◄        ►



No meditating, unless you have your eyes open.

Google 2016

## Local Software Engineer Threatened with

Dallas De Facto Meditation Ban | Dallas Observer

# Local Software Engineer Threatened with Ticket for Meditating Downtown

**ERIC NICHOLSON** | **APRIL 28, 2016** | **4:00AM**

Andy Seremetis likes to meditate. You might even say he *needs* to meditate. Too many days without meditating and his mood sours and days he would typically sail through become a slog.

"It creates a feeling of being present," he says. "I notice things around me more. I'm not thinking about what happened yesterday or what's going to happen tomorrow."

He prefers to have 45 minutes of uninterrupted contemplation, which he times with a meditation app on his phone that emits an unobtrusive chime every five minutes. But Seremetis works full time as a software engineer and has a life, so he doesn't always have 45 minutes to spare. Lately, he's taken to squeezing weekday meditation into his lunch break. There are plenty of peaceful nooks along Commerce Street downtown that are both close to his favorite lunch spot, Spice in the City, and suitable for 20 to 25 minutes of focused solitude.

"I just go and sit," Seremetis says. "Sometimes I sit cross-legged on a stone or something." On Monday, he settled into a leafy plaza next to AT&T's towering white stone headquarters. "This time I chose to sit on the bench because I think my pants were too tight."

Seremetis opened his meditation app, sat up straight, and closed his eyes. "About seven minutes in, one security guard came up to me and asked if I was sleeping," Seremetis recalls. "I said I wasn't."

The security guard walked away. Seremetis closed his eyes. His phone chimed a second time. It hadn't made it to a third when Seremetis was interrupted by another security guard, this one accompanied by a man Seremetis took to be a Dallas PD bike cop on account of the uniform with the official-looking patch on the sleeve and his authoritative manner.

"Are you meditating?" Seremetis remembers the cop figure asking.

"Yeah. Yeah, I am," Seremetis replied.

"Well, can you do it with your eyes open, because [otherwise] they'll think you're sleeping and they'll give you a $300 ticket."

The tone of his voice told Seremetis that by "they," the cop figure meant "I."

It's worth pausing here to unpack a few things. One is to acknowledge that Seremetis was on private property. While the plaza next to AT&T's headquarters is open to the public and has the appearance of a small park, Seremetis was there at the pleasure of AT&T.

It's also not clear whether the cop figure was actually a cop. Dallas PD patrols downtown but so does the Downtown Safety Patrol, whose uniforms look awfully cop-like but who are actually security guards who can't write tickets or make arrests. When asked. Seremetis couldn't



Andy Sermetis

say, just that he was under the impression that he was talking to a cop.

If the officer was DPD, he would presumably have known that a sleeping-in-public ticket sets one back $146, not $300, and that Seremetis could almost certainly beat the fine by convincing a municipal judge that closing ones eyes to meditate does not qualify as "sleep[ing] or doz[ing]," which is what the city's sleeping-in-public ordinance explicitly bans.

None of which does much to lessen the absurdity of the situation.

If the cop figure was an actual cop, he should have had something better to do. If, as seems more likely, he represented the Downtown Safety Patrol, he was still operating under color of officialdom. They have their official-looking uniforms and are funded by the Downtown Improvement District, which was created when City Hall agreed to let downtown property owners tax themselves and use the revenue to improve and provide extra security for their small corner of the city. Though technically employed by a nonprofit, Downtown Dallas Inc., the safety patrol is both a product and enforcer of city policy, as Downtown Dallas Inc. spokeswoman Shalissa Perry emphasized in response to a question about the organization's meditation policy.

"We don't have a meditation policy per se. DSP just helps enforce the 'no sleeping in public' city ordinance when necessary," she wrote in an email.

One such policy is the city's aforementioned ban on sleeping in public, which was created and has been used aggressively as a tool to keep the homeless from cluttering up downtown. Seremetis, with his thick beard and wavy mane of hair, can appear scruffy, but he's not homeless. "I wear [my hair] in a bun at work," he says. "I don't look like a businessperson or anything, but I don't look like a vagrant either. I wear nice shirts.

... some our uses suits ...

That day I had a really nice shirt."

Even if he was homeless, so what? There's a case to be made – not terribly convincing but at least coherent – that economic development and neighborhood-building in the city's core justifies the thousands of sleeping-in-public tickets DPD writes every year; businesses and residents won't want to come downtown if everyone has to step over sleeping homeless people. But does Dallas really want to be a place where people get harassed by cops and/or security guards for meditating? (If the answer is "yes," then the City Council should probably write "go to Austin, hippy" into the city code.)

Seremetis certainly thinks downtown's de facto meditation ban is absurd. Not that he plans to stop. "I really had no response," Seremetis says of Monday's encounter. "I was still really calm from my meditation. I just kind of looked at him and smiled."

RELATED TOPICS:    NEWS    CITY HALL

©2018 Dallas Observer, LP. All rights reserved.

Exhibit
9

5/14/2018     Woman who 'Will Rap 4 Weed' sues Dallas over panhandling ordinance it can't enforce | Commentary | Dallas News

Case 3:18-cv-00076-N    Document 97    Filed 08/26/19    Page 50 of 114    PageID 1554



☰ **ALL SECTIONS**                                                                                      SUBSCRIBE

COMMENTARY    JAN 18

## Woman who 'Will Rap 4 Weed' sues Dallas over panhandling ordinance it can't enforce



*Robert Wilonsky, City Columnist*

Don't miss a story. Like us on Facebook.     LIKE DALLAS NEWS

The city of Dallas has finally been sued in federal court over its panhandling ordinance. And the plaintiff is a woman running for Texas governor. No, no. Not former Sheriff Lupe Valdez. Try instead Yvette Gbalazeh, the street-corner activist otherwise known as "Will Rap 4 Weed."

And, no, that's not the punch line. This is:

Gbalazeh and her attorney and City Hall higher-ups are on the same side here. More or less.  As City Attorney Larry Casto put it Wednesday when I asked about the complaint that says begging ordinances violate First Amendment rights, "It's not like we're necessarily at odds."

Stop panhandling in Dallas? Sorry, but that's illegal

Because if we've learned anything in recent weeks, it's that the people at City Hall tasked with enforcing the laws — Casto and Dallas Police Chief U. Renee Hall — don't think the begging law's any good. Well, at least the part of the law that outlaws begging. Threatening someone for their cash money is still illegal; so is assaulting a passer-

"The ordinance is just a way to give people a hard time you wouldn't ordinarily be able to give a hard time to," Gbalazeh said Thursday.

The City Council has spent forever trying to push panhandlers off sidewalks and into the shadows. And the city swears it wants to do more than that. It proposes putting up signs begging people not to give to beggars. Or a jobs program for panhandlers. Or installing donation boxes in Deep Ellum that look like parking meters.

But it can't settle on the what or how or who, because not all panhandlers are the same. Some are homeless, mentally ill, drug addicted. And some are pros who don't want to work. So City Hall does what it's best at: biding its time and threatening them all with $500 fines they can't pay and jail time that only makes it harder to find a job.

The '07 version of the law says vanishing beggars from downtown and Uptown and Deep Ellum especially is "in the best interest of the public health, safety and welfare." Not so much, the Supreme Court has said, most recently in 2015, when a scrap over church signs ended with the Supremes ruling that cities can't regulate what people say. Ever since, big cities across the country have ditched or rewritten their panhandling ordinances.

Which is why Casto took the council behind closed doors in September and told them the panhandling ordinance is a loser. He said the same thing earlier this month after cops were told in a training bulletin at December's end to only go after folks scrounging for coin in the roadway. Hall explained the change to the council last week. Some on the council didn't understand it. And some, who want the cops to chase off and break the spirits of

5/14/2018    Woman who 'Will Rap 4 Weed' sues Dallas over panhandling ordinance it can't enforce  | Commentary | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 52 of 114   PageID 1556

Dallas Council not impressed with idea of using parking meters to curb panhandling

Now, there's more to Gbalazeh's lawsuit than just the free-speech part. She also wants damages for being arrested and having her rights violated. And her lawyer, Ramon Rodriguez, is hoping to turn this into a class action, since, according to his math, the city arrested or fined some 40,000 people for solicitation between 1999 and 2016, when Gbalazeh was twice taken to county lock-up.

"Most of those people don't have a voice," Rodriguez said Wednesday. "They don't have anyone to fight for them."

But the bulk of the lawsuit takes aim at the constitutionality of the ordinance. Says the complaint, the law targets "Dallas' less fortunate residents [and] literally silences these Dallasites in order to shield more economically fortunate people from speech that makes them uncomfortable."

Casto said the city's ready with a defense: "Our argument will be we are now squarely in compliance with current federal case law." But, he acknowledged Wednesday, an internal DPD memo doesn't erase the fact the law's still on the books, making the city ripe for lawsuits like this one.

"With respect to the free speech claim only, we have no fundamental disagreement with the basis of the allegations," he said about Gbalazeh's suit.

I asked the city attorney if they're looking at erasing the ordinance completely. Said Casto, "We are reviewing

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 53 of 114   PageID 1557

After council complaints, Dallas police to place no-panhandling signs in and around downtown

The 36-year-old Gbalazeh has long advocated for cite-and-release and decriminalizing weed. Sometimes she does that at City Hall or Dallas County Commissioners Court. And sometimes she does that on Deep Ellum and South Dallas street corners, much to the chagrin of the Deep Ellum Community Watch-ers who told Central Track in the spring of 2015 that she was "an especially aggressive panhandler who was quick to get in the face of passers-by who weren't charmed by her pro-marijuana stance."

She told this newspaper in September 2015 that cops leave her alone. A few months later, she was arrested, twice in the span of two weeks. Gbalazeh and Rodriguez, who met through another man popped for panhandling, have been working on filing the lawsuit ever since. So happened they filed at just the right time.

"I will be the poster child for this fight," Gbalazeh said. "And I have no problem with that."

Will Rap for Weed Lawsuit by Robert Wilonsky on Scribd

5/14/2018     Woman who 'Will Rap 4 Weed' sues Dallas over panhandling ordinance it can't enforce   | Commentary | Dallas News

Case 3:18-cv-00076-N   Document 97   Filed 08/26/19   Page 54 of 114   PageID 1558

**COMMENTARY**     **DALLAS CITY COUNCIL**     **DALLAS CITY HALL**     **CRIME**     **COURTS**



One of the best concerts of the year just came to Dallas — and you may not...

‹ Prev     Next ›

5/14/2018     Woman who 'Will Rap 4 Weed' sues Dallas over panhandling ordinance it can't enforce  | Commentary | Dallas News

Case 3:18-cv-00076-N    Document 97    Filed 08/26/19    Page 55 of 114    PageID 1559

# *OPINION*

↻ LOADING...

About Us

Careers

Advertise

Contact Us

Special Sections

FAQ

Privacy Policy

Terms of Service

Site Map

*©2018, The Dallas Morning News Inc. All Rights Reserved.*

Exhibit
10

5/14/2018

Dallas on Shakey Legal Ground With Panhandling Bans | Dallas Observer





5/14/2018

Dallas on Shakey Legal Ground With Panhandling Bans | Dallas Observer



This is free speech, according to recent court rulings.

Hannly Sam via Flickr

# Despite Changes, Dallas Panhandling Enforcement Still Probably Illegal

**STEPHEN YOUNG** | **JANUARY 5, 2018** | **4:00AM**

Over the last couple of weeks, a small furor has developed around the issue of combating panhandling in Dallas. The week before Christmas, several Dallas Police Department commanders ordered their troops to stop issuing citations for "solicitation by coercion" — aggressive panhandling — or panhandling near gas pumps or ATMs because the citations might not be legal. Instead, the commanders said, laws banning panhandlers from asking drivers on Dallas streets for cash should be the primary means of rousting beggars.

A directive from Dallas police Chief U. Renee Hall issued the following week again emphasized panhandling enforcement using the roadway solicitation ban. Both moves are intended to keep the city out of legal trouble. For the past two years, courts across the country have stuck down panhandling bans.

The problem is that the city's law against panhandling along roadways might not pass a court challenge, either, says a lawyer with the American Civil Liberties Union of Texas.

In 2015, the U.S. Supreme Court decided Reed v. Gilbert, a case that slapped down an

Arizona town for banning a church from posting temporary directional signs while allowing residents to post political signs of the same size. Using Gilbert as precedent, homeless advocacy groups have won a series of verdicts establishing panhandling as protected free speech, leaving Dallas' solicitation by coercion law, which also bans panhandling between sunset and sunup and in downtown and Deep Ellum, vulnerable to a challenge.

**"When courts analyze these panhandling ordinances, they generally find that they're content-based restrictions on speech and expression because it's saying you can't speak in this particular way in [an] area." - ACLU of Texas attorney Kali Cohn**

"Courts have held that panhandling is a form of charitable donation that is protected expression," says Kali Cohn, a staff attorney for the ACLU of Texas, one of the groups that's fought panhandling laws across the state. "When courts analyze these panhandling ordinances, they generally find that they're content-based restrictions on speech and expression because it's saying you can't speak in this particular way in [an] area."

Cohn says that by banning panhandling in the Central Business District and Deep Ellum but allowing other kinds of speech, like busking, the city has created an unconstitutional content restriction on the speech of residents and visitors to those areas. The same goes for the ban on panhandling near ATMs and gas pumps. By not enforcing those provisions of city code, DPD hopes it can stave off a potential legal challenge because it won't be creating potential plaintiffs for a suit by issuing citations.

But the city ordinance the department is explicitly enforcing isn't enforced uniformly.

"The solicitation on a roadway ordinance is messed up because we don't enforce it evenhandedly," Dallas City Council member Philip Kingston says. "We let the firefighters fill the boot, but then if you ask somebody for something on a roadway, then you're breaking the law."

Cohn wouldn't comment on whether the ACLU of Texas plans to sue Dallas over its panhandling enforcement but said a court likely wouldn't look favorably on the city's ordinance.

"I don't want to comment directly on whether [Dallas's panhandling rules] are or aren't subject to a challenge," Cohn says, "but, based on current case law around the country, provisions like that have been found to be problematic."

RELATED TOPICS:     NEWS     CITY HALL     LEGAL BATTLES

©2018 Dallas Observer, LP. All rights reserved.

Exhibit
11

Ergonomic
Office Ch...

$299



5/14/2018

Dallas Panhandling Law Unlikely to Survive Legal Challenge | Dallas Observer



Beth Swanson

# Dallas Is Probably Screwed If It Gets Sued over New Panhandling Crackdown

ERIC NICHOLSON | FEBRUARY 3, 2016 | 4:00AM

When Deputy Chief Gary Tittle formally announced the Dallas Police Department's new downtown panhandling crackdown on Monday, he was careful to define the target of the operation as "that aggressive panhandler, the one approaching an individual demanding money, asking for money, impeding their walkway on the sidewalks, getting out into the street, on the curbs, moving out into the highway from the shoulder of the highway."

To a certain extent, the narrow focus on aggressive panhandlers is simple pragmatism. They are the ones that can make walking downtown sidewalks feel like running a gauntlet; the guy politely asking for change is a comparatively minor annoyance. But there also seems to be a good deal of legal ass-covering at work, a hint of which could be picked up in Tittle's description of aggressive panhandlers. Most of the actions he described (i.e., wandering into a roadway) can be construed as illegal in their own right, regardless of whether an individual is asking for money.

This is significant because prosecuting people for panhandling triggers certain constitutional questions, the answers to which aren't terribly favorable to places that outlaw the practice. Asking for money – which, if you strip away the discomfort of passersby and don't count the hyperaggressive Darryl Davises of the world, is all panhandling is – is a form of speech that courts generally agree is protected by the First Amendment, even if the U.S. Supreme Court has never directly weighed in. Absent some

Amendment, even if the U.S. Supreme Court has never directly weighed in. Absent some offensive act (the Supreme Court has ruled that conduct doesn't enjoy the same protection as speech), the barriers to government curtailing any type of speech are high. Concerns that begging makes passersby uncomfortable or harms the perception of certain neighborhoods don't cut it.

And so, for the past quarter-century, cities have tried to craft panhandling bans that are narrow enough to pass constitutional muster while still being potent enough to effectively address the concerns of residents and business owners. Dallas designated certain downtown neighborhoods (i.e., the Central Business District, Deep Ellum, Uptown and Victory Park) as "solicitation-free zones" and banned panhandling within 25 feet of parking meters, pay phones, gas pumps, ATMs, DART stops, restaurants and car washes. Asking for money is also illegal between sunset and sunrise (the official times, according to city code, are based on the daily listing on *Dallas Morning News*' weather page), as is aggressive panhandling, i.e., "solicitation by coercion." The latter is the charge DPD appears to be relying upon during its crackdown.

In the past, Dallas might have been on reasonably solid legal ground. In June, however, it became much shakier after the U.S. Supreme Court ruled 9-0 that Gilbert, Arizona, had unconstitutionally restricted the speech of a small, itinerant church by limiting the size and duration of signs directing worshipers to its services while allowing campaign and other signs to be larger and remain up longer.

The ruling didn't address begging per se, but it subtly expanded the types of speech restrictions likely to be overturned on constitutional grounds. Treating speech differently based on its message was already a well-established no-no, a notion that had been baked into the Town of Gilbert's sign law. It was studiously viewpoint-neutral, treating all campaign signs, be they Democrat, Republican or third-party, just as it

treated all temporary directional signs the same, whether they led to a small evangelical church or a gathering of atheists. In the majority opinion, Justice Clarence Thomas wrote that "[singling] out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter" is unconstitutional.

In case the implications for panhandling laws wasn't sufficiently clear, the court at the same time asked a federal judge to reconsider his decision to uphold a ban on aggressive panhandling in Worcester, Massachusetts, in light of the *Gilbert* decision.

"It used to be that, before *Reed v. Gilbert*, blanket bans were unconstitutional, but more nuanced, aggressive panhandling ones, depending on the wording, depending on what was at issue, those were making it through," says Eric Tars, senior counsel at the National Law Center on Homelessness & Poverty. "Since *Reed*, even the aggressive panhandling ones have been thrown out."

The first victim was an anti-panhandling law in Springfield, Illinois. A federal appeals court in Chicago had initially upheld the law but, citing *Reed*, reversed course and overturned it. The next month a federal judge rejected a Grand Junction, Colorado, law that, like Dallas' ordinance, banned people from asking for money after sundown or within a certain distance of ATMs and restaurants. In October, a Lowell, Massachusetts, law that banned panhandling in a broad area of downtown, echoing Dallas' "solicitation-free zones," met the same fate.

Some cities aren't waiting to be taken to court. Denver has stopped enforcing its panhandling law, as has Madison, Wisconsin. "Any city that has a panhandling law on the books should be taking a serious look at at least stopping enforcement and considering taking it off the books, because it's a sitting duck," Tars said in an interview

Dallas Panhandling Law Unlikely to Survive Legal Challenge | Dallas Observer

last week. Five days later, DPD announced its crackdown.

Of course, sitting only becomes dangerous for ducks when there's someone shooting at them, which is to say that Dallas is free to crack down on panhandlers as hard as it likes until and unless some convicted panhandler files a lawsuit.

RELATED TOPICS:     NEWS     CITY HALL     POLICE

©2018 Dallas Observer, LP. All rights reserved.

# Exhibit 12

5/14/2018

Dallas Panhandling Policy Update: It's OK to Beg, Mostly | Dallas Observer

server



An innovative panhandling solution

Dallas Panhandling Policy Update: It's OK to Beg, Mostly | Dallas Observer

Blake Burkhart

# Dallas' Panhandling Situation Isn't Nearly as Complicated as the Police Chief Makes it Sound

**STEPHEN YOUNG** | **JANUARY 9, 2018** | **4:00AM**

Right now, Dallas residents and visitors are free to panhandle whenever they want, however they want, as long as they don't solicit from people in cars or commit another criminal offense, like assault. That's the upshot of the Dallas Police Department's new training bulletin on panhandling enforcement, issued in response to a potential legal challenge of the city's "solicitation by coercion," or aggressive panhandling, ordinance. Listening to new Dallas Police Chief U. Renee Hall talk to the Dallas City Council's Public Safety Committee about panhandling Monday, however, you'd never know it.

Early in Monday's meeting, City Council member Sandy Greyson asked Hall whether newspaper stories saying that DPD can't enforce existing panhandling regulations because they are likely to be found unconstitutional were accurate.

"The ordinance is not telling us that we can enforce panhandling, per se. The ordinance tells us from the Dallas Police Department, that we're able to enforce certain provisions of the panhandling ordinance, which is those areas surrounding. Now, the city ordinance tells us that you can enforce panhandling. So what we're saying, and what we've been advised, and what this body has been advised, is that panhandling within itself has been deemed unconstitutional," Hall said.

"Unconstitutional? Or it's been deemed constitutional?," Greyson asked.

"I'm sorry. Constitutional. And so, enforcement of it opens us up for litigation," Hall said.

So the answer to Greyson's question was, we're pretty sure, "Yes, the stories were right."

Then, City Council member Philip Kingston asked Hall if the city still had any panhandling free zones, like Deep Ellum or the Central Business District.

"Any panhandling free zone that's existed, we have not changed any panhandling free zones," Hall said. "I think we have to work with legal to figure out if those zones are actually enforceable, if we are able to actually keep them as a panhandling free zone based on the ordinance."

"So, today, are officers able to write citations based on the panhandling free zones?" Kingston asked.

"Right now, officers are writing citations based on the two ordinances that have been issued to them from our roll call training bulletin," Hall said. "These are the [ordinances] that we've said are enforceable for the Dallas Police Department."

## "It's not hard to get in touch with us. I don't want to read about it in the paper. Just let us know." - City Council member Adam McGough

"That does not include the panhandling free zones," Kingston said.

"We have not given direction on the panhandling free zone. We've only instructed officers to enforce those ordinances that we have issued to them in a training bulletin," Hall said.

"And not enforce anything else?" Kingston asked.

"To enforce those that we've issued in a training bulletin. It is our obligation when we're put in these positions to ensure that puts the city and/or the police department in a position of litigation that we move in an aggressive manner to prevent that," Hall said.

This is a tougher one, but our best reading is that she said "No, we're not enforcing panhandling free zones."

The chief went on to tell both Kingston and committee chairman Adam McGough that she should've done a better job informing the council of the enforcement policy changes before they were implemented in December.

"I would appreciate not just an attempt [to communicate better with us]," McGough said. "It's not hard to get in touch with us. I don't want to read about it in the paper. Just let us know."

Speaking in plain English would be helpful to both the council and the media, but that's just our suggestion.

The council's next look at panhandling is scheduled for Feb. 26, when city staff will provide an update on "Give Right Dallas," the city's yet-to-begin marketing campaign intended to cut off panhandling at the source by encouraging those who would otherwise give to individuals to give to homeless support organizations. Or maybe the

Dallas Panhandling Policy Update: It's OK to Beg, Mostly | Dallas Observer

city could have officers explain the program to panhandlers until they get bored and confused and just go away.

RELATED TOPICS:   NEWS   CITY HALL   CRIME   POLICE

©2018 Dallas Observer, LP. All rights reserved.

Exhibit
13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVETTE GBALAZEH, LEE SUNBURY, and FRED SIMS, on behalf of themselves and all others similarly situated, | § § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | CIV. CASE NO. 3:18-cv-00076-N |
| CITY OF DALLAS, TEXAS, a municipality of the State of Texas, | § § § | |
| Defendant. | § § | DEMAND FOR JURY TRIAL |

## UNSWORN DECLARATION OF
## YVETTE GBALAZEH

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1.  My name is Yvette Gbalazeh. I make this declaration pursuant to 28 U.S.C. § 1746 and Section 132.001 of the Texas Civil Practice and Remedies Code. I am above the age of 18, of sound mind, and competent to make this Declaration. All facts stated herein are within my personal knowledge and are true and correct.

2.  I am a resident of Dallas County. I have lived in the City of Dallas since  2013  .

3.  I am a political activist and I exercise my rights to free speech and assembly by advocating for medical marijuana reform and legalization and, in this case, representing a class of persons whose constitutional rights have been violated.

4.  I share my message at city council meetings, criminal justice advisory board meetings, and the Dallas County Commissioner's Court. I have even spoken with Dallas County Sheriff Lupe

Valdez and appeared in front of nationwide television audiences in support of this cause. Additionally, I bring awareness to the issue through lyrical performance in traditional public forums. As part of my performance and in order to maximize my audience, I utilize a homemade cardboard sign that contains the slogan behind my mission: *"Will Rap 4 Weed."* I have regularly engaged in and wish to continue to engage in lawful, peaceful free speech in the City of Dallas.

5.   My political activism stems from my personal battle with an eating disorder since I was 15 years old. In the early 2000s, I moved to California where I became a medical marijuana patient, on the advice of doctors who informed me that the drug might help me deal with the symptoms, but whose hands were tied because they were situated in Texas where marijuana is illegal. After receiving my patient card, nearly ten years after her initial diagnosis, I found that the drug was effective at easing my symptoms and enabling me to overcome the disease. This inspired my activism and birthed the idea for using the slogan "Will Rap 4 Weed" to help spread my message.

6.   In 2013, I moved to the Houston, Texas area and continued my activism for my rights and other patients' rights for medical marijuana.[1] My "Will Rap 4 Weed" message went viral and I was chosen by the *Houston Chronicle* as one of Houston's 43 most fascinating people.[2] Local media outlets began running reports about me as the "Will Rap 4 Weed" activist, I performed my

---

[1] *See* Craig Hlavaty, *'Will Rap 4 Weed' Sign is a Political Statement, Not a Request*, HOUSTON CHRONICLE, Sept. 3, 2013, http://blog.chron.com/thetexican/2013/09/will-rap-4-weed-sign-is-a-political-statement-not-a-request/ (last visited Feb. 17, 2018).

[2] *See Houston's 43 Most Fascinating People*, HOUSTON CHRONICLE, http://www.chron.com/life/slideshow/Houston-s-43-most-fascinating-people-75322/photo-5550408.php (last visited Feb. 17, 2018).

street rap on the George Lopez show, and I also made an appearance on Jerry Springer's show "Baggage."[3]

7.  Later in 2013, I moved to Dallas and continued my boots-on-the-ground campaign on the various street corners of Deep Ellum in southeast Dallas. Despite receiving threats and hostility from various individuals who disagree with my message, I have continued my political activism by invoking my constitutional right to protest what I feel is not just a civil rights violation but a human rights issue as there are patients receiving medical marijuana in other states which have already legalized it. My activism is a full-time job insofar as I attend city council meetings, advisory board meetings and other government functions related to my mission. Notably, I am running for Texas Governor in 2018 in order to affect the medical marijuana policy reforms I desire.[4]

8.  I was arrested on February 13, 2016 and February 20, 2016 for allegedly violating the Vehicle Panhandling Ordinance. Specifically, I was located on a sidewalk in Deep Ellum in southeast Dallas when I was arrested. I was wearing my standard protest attire bearing symbols and references to medical marijuana. I was also peaceably holding my signature cardboard sign which reads "Will Rap 4 Weed." After my arrest for violating the Vehicle Panhandling Ordinance, I was transported by the Dallas Police Department to the Dallas County Jail and segregated from the Dallas County inmates in a separate holding cage. During my transportation, I was placed in

---

[3] *See* Yvette Gbalazeh, *Will Rap 4 Weed with George Lopez and Jerry Springer*, YOUTUBE, Jun. 25, 2012, https://www.youtube.com/watch?v=DkLM8gGXto4 (last visited Feb. 17, 2018).

[4] *See* Amber Joseph, *Weed Activist Running for Texas Governor to Re-Legalize*, CROSSROADS TODAY NEWSCENTER, December 7, 2017, http://www.crossroadstoday.com/story/37016934/weed-activist-running-for-texas-governor-to-re-legalize (last visited Jan. 8, 2018).

the rear of a police van while the officers continued to arrest other persons. This took nearly an hour. During that time, I was forced to place my weight on my hands to keep myself from falling forward onto my face, which caused injury to my right shoulder.

9. After my first arrest on February 13, 2016, I was taken before a magistrate judge in the Dallas Municipal Court System ("**DMCS**"). During that initial appearance, myself, along with other persons arrested under the Challenged Ordinances who are members of the class of poor and/or homeless Plaintiffs herein, were told by the DMCS magistrate judge that, in exchange for the entry of pleas of no contest, we would be given jail time served as a sentence and released that day. We were further told by DMCS that the City of Dallas could not afford an attorney for us before entering a plea of no contest or guilty and that an attorney would not be so appointed. We were then instructed that failure to enter a guilty plea at that initial appearance would result in our continued detention without bond until February 17, 2016. Given the conditions of my detention, and my inability to speak to legal counsel, I—along with many other Class Plaintiffs present at that hearing—entered a plea of no contest in exchange for a release based on jail time served.

10. After my release, I subsequently obtained legal counsel. Nevertheless, on February 20, 2016, I was arrested again for allegedly violating the Vehicle Panhandling Ordinance. After my second arrest, I was again transported by the DPD to the Dallas County Jail where I re-aggravated my shoulder injury while sleeping on the concrete. Like my experience during the first arrest, I was ultimately brought before a DMCS magistrate judge where, along with other class Plaintiffs, we were not fully advised of our rights or assisted with requesting appointment of counsel. Again, without the opportunity to retain counsel or have counsel appointed, we were similarly presented with the choice of entering a no contest plea in exchange for jail time served or going back to jail

for several days to wait for a subsequent hearing. After pleading no contest, myself and others who also pled no contest were released.

11. Since my arrest in 2016, I have curtailed my protest activities. For a period of approximately four months, I stopped my protests altogether because I was afraid that I would be arrested again. It wasn't until July 8 or 9, 2016, that I resumed my protest activities on the streets of the City of Dallas. Since returning to the streets to protest and advocate for my cause, I have been afraid that I will be arrested again.

12. As a result of the aforesaid wrongful charges brought against me for violation of the Free Speech Ban and/or Vehicle Panhandling Ordinance, I suffered physical injuries, emotional distress, mental anguish, humiliation, and psychological trauma.

13. My date of birth is _03/27/1981_. My address is _5123 Echo Ave. Dallas, TX 75215_. I declare under penalty of perjury that the foregoing is true and correct.

Executed at Dallas, Dallas County, Texas, on this 21 th day of August, 2018:

Declarant, Yvette Gbalazeh

### END OF DOCUMENT ###

Exhibit
14

**THE TEXICAN**

## 'Will Rap 4 Weed' sign is a political statement, not a request

By Craig Hlavaty on September 3, 2013 at 12:31 PM



Yvette Gbalazeh stands on the corner of Montrose and Westheimer, Thursday, Aug. 29, 2013, in Houston. (Cody Duty / Houston Chronicle)

It's a muggy Thursday morning and Yvette Gbalazeh is already out on the corner at Montrose and Westheimer wielding her WILL RAP 4 WEED sign just as daylight begins to break over the intersection. A block away there is a protest at Jack in the Box to get the minimum wage doubled, but Gbalazeh is largely oblivious. She's out on this corner near Valero to get the word out about the legalization of marijuana for medicinal use. She's against people abusing it. She calls it "self-medicating."

Gbalazeh does, in fact, rap under the name Lyris. She even has a presence on social media.

"I don't advocate it as a party drug," Gbalazeh says, as early morning commuters give her puzzled looks or a thumbs up. Bedraggled teens in flat-brim caps smile and wave. Stodgy business people grin in their office-best, or they look away annoyed.

On the opposite side of the street you can sometimes catch anti-gay protesters, riling those in the neighborhood. Gbalazeh offers up something more palatable for locals. For me, she represents a part of Montrose counterculture that is slowly dwindling away as new bars and restaurants pile up, catering to those who don't remember places like Mary's or Emo's. It's not a bad thing; it was bound to change sometime.

self-proclaimed "black redneck" and former University of Houston cheerleader, and stare at her for a few hours and move on. A few men have approached her for less-than-reputable services. She laughs it off, knowing that being on a street corner doesn't help.

When Gbalazeh says she will rap for weed, she really means that she is rapping for the legalization of the stuff. She's not here to accept free samples, either. Give her a letter in the alphabet and she will freestyle a dozen bars. I give her the letter H.

Words like herb, humanitarian, hampering, helpless, harmless, headhunt, and hideaway spill from her mouth as she continues to wave at drivers. Her voice, rapping and speaking, is pleasing to the ears. When she does talk about her weed philosophy, she speaks clearly and deliberately. Every point is made succinctly, without any fat.

Preteens are especially excited to see her.

"Kids over the age of 7 all know what weed is," she says. "It's funny to see them smile and point." I see this happen a few times during my visits with her on the corner. The parent usually scolds the child or shakes their head in disapproval. I can only imagine the talking-to that comes after. Gbalazeh says that baby boomers are some of her most vocal supporters.

"I'll see guys in expensive cars wave and tell me right on. They remember when marijuana was more free," she says.

Victoria-native Gbalazeh lives in her car, parked just a block or so away. She uses the Internet at Burger King next door and a good Samaritan just fixed her MacBook for free. The 32-year-old says she can make $50 an hour, depending on traffic and the time of day, and the generosity of Houstonians who want to hand her a few bucks.

Police have asked about the sign and she thinks that drug dealers have called the police on her. She was hassled by some Galveston cops near the Pleasure Pier and got a ticket. She's been approached by community firebrands that want to help her cause, but she knows that their involvement would just debase her message.

"They don't like that I am advocating it for medical reasons," she says. "Besides, why should someone have to contribute to organized crime to medicate themselves?"

She tells me that when she was suffering from OCD and eating disorders she was told by a doctor at a Charter Hospital in Corpus Christi that maybe she should try marijuana to cure her ailments. This happened, of course, unofficially.

As for the sign, she calls herself a performance artist (she has a mobile DJ kit in the car), and it is a part of her performance. Her performance is also a protest.

Does she think that Texas will go the way of the other states in the union that have approved weed for medicinal use? Yes, but even she concedes it will awhile.

"Minds are slowly changing. It's a process."

Sponsored Links

**Born Before 1985? Texas Will Pay $355/Month Off Your Mortgage (Only If You Claim It)**
Money News Tips

**This app can teach you Spanish in under 3 weeks**
Babbel

**New Golf Hybrid Changing The Game**
iRT5 Golf

## You May Like

Sponsored Links

**Tom Cruise Finally Confirms New Mansion In Texas**
WorldLifestyle

Sponsored Links

**Jefferson 12 ft. W x 3 ft. H Black Aluminum 3-Rail Double Drive Fence Gate**
$572.40 - homedepot.com

**This Photo Has Not Been Edited, Look Closer**
HistoryInOrbit.com

**This App Applies Every Coupon on the Internet to Your Cart**
Honey

## You May Like

Sponsored Links

**Texas Launches No Cost Solar Program**
Energy Bill Cruncher Solar Quotes

**The Surprising Reason June Cleaver Always Wore Heels To Do Housework**
Trendchaser

Sponsored Links

**New Wedge Designed To Eliminate Fat & Thin Chip Shots**
Square Strike Wedge Golf

**My Husband and I Tried Blue Apron, Here's What Happened**
Blue Apron

**Photographers Captured These Moments When It All Went Wrong**
Auto Overload





### Recommended For You

**Ice dancer expertly plays off wardrobe malfunction during Olympics performance**

**Galveston's storied 'Kettle House' history revealed**



### FROM THE WEB

Sponsored Links

**Check Out Why DJI Mavic Air Is The Best Drone For All Beginners.**
DJI Buying Guides

**Is the GX7 Golf Driver Replacing Traditional Drivers?**
GX7 Golf

**Two Savings Accounts That Pay 10x What Your Bank Pays**
MyFinance Bank Referrals

**25 Best Selling SUVs of 2017**
Kelley Blue Book

by Taboola

## Blog Search

Keyword search across all the entries in this blog.

| Keyword | GO |
|---------|----|

**Recent Posts**

The 'Scary Stories' series from your childhood is getting the documentary treatment

Does this recent 'South Park' episode hit close to home, Houston?

Astros historian has fond, cherished memories of the Milo Hamilton

Behind-the-scenes with Astros superfan and authentication manager Mike Acosta

A Texas country legend tells the New York Times how to write the perfect song

Houston's favorite mosquito repellents and bite remedies collected

ZZ Top to literally play "La Grange" in La Grange for the first time ever

Beyoncé and Lone Star Beer, a winning combination



Rec

Chris on Ren Fest, Halloween bring dangerous weekend driving to Montgomery County

BOB on Ren Fest, Halloween bring dangerous weekend driving to Montgomery County

BB on Ren Fest, Halloween bring dangerous weekend driving to Montgomery County

Roy on Ren Fest, Halloween bring dangerous weekend driving to Montgomery County

## Archives

Browse previous blog posts by month and year of entry. You'll see all the posts for that time period.

Select Month

## Pages

Sample Page



BONOBOS

Return to Top

**About** | Our Company    Careers    Advertise with Us    Ad Choices        Terms & Conditions    Privacy Policy    Your California Privacy Rights

**Contact** Customer Service    Newsroom Contacts
|

**Connect** Email Newsletter    Facebook        Twitter        Pinterest        Google        Instagram
|

**Subscribe** app    HoustonChronicle.com    Houston Chronicle Archives    eEdition Demo    Today's eNewspaper
|

Â© Copyright 2018 Hearst Newspapers, LLC

Exhibit
15

# Houston's 43 most fascinating people

Each year, the Chronicle editorial staff picks the most interesting people from across the Houston area. Here is the most recent list of people we can't stop talking about.

By Compiled by the Chronicle newsroom



**IMAGE 13 OF 49**

**Yvette Gbalazeh**

Gbalazeh caught the eyes of plenty of drivers at Montrose and Westheimer, and the ear of the local news media, when she took to the streets with a promise to "rap 4 weed." **She said her goal is to get the word out about legalizing marijuana.**

less

2,893

Add to Cart

Sponsored Links

**We Can Guess Your Education Level with Only 10 Questions**

Definition

**This Photo Has Not Been Edited, Look Closer**

HistoryInOrbit.com

**Tom Cruise Finally Confirms New Mansion In Texas**

WorldLifestyle

## You May Like

Sponsored Links

**New Wedge Designed To Eliminate Fat & Thin Chip Shots**

Square Strike Wedge Golf

### FROM THE WEB

Sponsored Links

**Born Before 1985? Texas Will Pay $355/Month Off Your Mortgage (Only If You Claim It)**

Money News Tips

**This app can teach you Spanish in under 3 weeks**

Babbel

**New Golf Hybrid Changing The Game**

iRT5 Golf

**Enmag Skirt - Black - Iro Paris**

iroparis.com

Suspects In Deadly Home Invasion Cry In Court

Design Bump

by Taboola

Sponsored Links

**This App Applies Every Coupon on the Internet to Your Cart**

Honey

**Texas Launches No Cost Solar Program**

Energy Bill Cruncher Solar Quotes

**The Surprising Reason June Cleaver Always Wore Heels To Do Housework**

Trendchaser

## You May Like    Sponsored Links

**Two Savings Accounts That Pay 10x What Your Bank Pays**

MyFinance Bank Referrals

**Born Before 1985? Texas Can Pay Your Mortgage**

Fetcharate

Sponsored Links

**Photographers Captured These Moments When It All Went Wrong**

Auto Overload

**My Husband and I Tried Blue Apron, Here's What Happened**

Blue Apron

**The Most Addicting Shopping Site For Women**

Tophatter

1,773

Shop now

3,004

Shop now

View Comments

## ⭐🄲 Recommended For You

**Ice dancer expertly plays off wardrobe malfunction during Olympics performance**

Galveston's storied 'Kettle House' history revealed

## You May Like

**This $199 Golf Driver is Changing the Game For Amateurs**

GX7 Golf

**Don't Do It Yourself - Hire A Austin Angie's List Handyman for Your Home Projects**

Angie's List

Sponsored Links

**Jefferson 12 ft. W x 3 ft. H Black Aluminum 3-Rail Double Drive Fence Gate**

$572.40 - homedepot.com

**Mantaa Coat - White - Iro Paris**

iroparis.com

**Take the Chaos Out of Fixed Asset Management**

Sage

Sponsored Links

**11 Tips and a Template to Build Your Own Expense Policy**

Concur Resources

**Improve Speed Of Response And Reduce Costs**

Microsoft

**Here's Where Highly-Educated Singles in Austin Find Dating Success**

EliteSingles.com

Sponsored Links

1,773

Shop now

 ## Recommended For You

**Deadly cartel power struggle continues in Mexico as 7 executed while dining (Warning: Graphic)**

**TV star: 'Sammy Sosa really gave it all up to be a white man from San Antonio'**

Exhibit
16

HOME    NEWS    WEATHER    SPORTS    SUNRISE    COMMUNITY    BUSINESS    OBITUARIES    ENTERTAINMENT    TV SCHEDULE    DOC

Start your free trial.

All the tools you need for every step of the way. squarespace.com



# Weed Activist Running for Texas Governor to Re-legalize

Posted: Dec 07, 2017 10:21 AM CST
Updated: Dec 07, 2017 10:21 AM CST

by Amber Joseph, News Interactive Producer    CONNECT

Yvette Gbalazeh, cannabis activist known for using her "Will Rap 4 Weed" sign to change policies, is running for Texas Governor in 2018 to re-legalize Weed. The University of Texas Political Science Poll 2017 states that 18 million Texans want cannabis re-legalized, whether it's for religious freedom, medical use, or recreational use. Yes, 18 million Texans want relegalization. Gbalazeh reminds us, "Only 2 million people voted for the current Texas Governor in the last race. But 18 million or 83% of Texans want CANNABIS LEGALIZED, and we're not getting it. It doesn't matter what the topic is, when 83% of us want something we should have it. Topics like: Debt, Opioid Abuse, Support for Veterans, Fracking, Immigration, Transgender Bathrooms, Health Care, Poverty, and reducing Violence are all issues Texans face. None of those issues are going to be addressed if the biggest issue that 83% of us want is being ignored. So I'm running in the 2018 Texas Gubernatorial race to represent 83% of Texans. I can't do this from the couch. I have to be in the race standing next to the Governor to force the issue. As a full time activist, I know there are a lot of important issues Texans have other than cannabis legalization. Thankfully, revenue from cannabis legalization helps solve a lot of them." Since filing to run in July 2017, Gbalazeh has gathered more than 50,000 pledges for the Official Petition beginning March 7, 2018 - June, 2018.

You can learn more about Gbalazeh's campaign by visiting Facebook.com/TXHumanBill.

Gbalazeh's Thoughts on the Governor's Job

"Although proud of my past, it doesn't matter what my race, gender, religion or opinions are when I am here to do a job, simply passing laws Texans want passed, and holding unlimited special sessions to force joint resolutions for Texans to choose what Texans want. I won't be making the decisions, Texans will. I'm just collecting data and giving the majority what the majority wants."

-Yvette Gbalazeh

My Bio

People are interested in my background, so my Father is a Medical Doctor and Lawyer. My Mother is a retired Registered Nurse and owned a gourmet restaurant I managed while I was a kid. Both parents are remarried. I have one sister Yvonne, she played in the Final Four for Stanford Women's Basketball. She runs marathons for kids with Leukemia, went to Wharton Business School, interned at Lehman Brothers, and became an investment banker. We both went to Our Lady of Victory private elementary school, raised Roman Catholic.

Born in Victoria, Texas on March 27, 1981, I started college courses at 16 years old, and walked on to the University of Houston competition cheer squad at the age of 17 as a tumbler.

I was diagnosed with an eating disorder and OCD in my youth and received treatment at Charter Hospital in Corpus Christi in 1998, where my eating disorder specialist recommended cannabis. I was dying and Charter Hospital saved my life. I was able to get out of college with an Associates Degree in the Arts, majoring in Psychology. I was sick and couldn't stay well with my medicine as a student at U of H. It was against the law.

I earned my black belt in Tae kwon do from my 2nd father, Master Ralph Jaschke. He is beating cancer. The Might for Right in my life is shaped by Ralph. In my 20's I worked so many jobs/gigs, mainly in the service industry and entertainment. A lover of the arts, the music world pulled me in through a group called Whodini. They shaped me to be an activist and use the power of my words to make positive change.

Living in Cut-N-Shoot, Texas on McRae Lake with my dog for 3 years, and learned to live on solar panels and natural water. The community helped me find myself after leaving an abusive situation. I re-learned the Bible as an adult and started my vow of poverty and celibacy. In 2006 I hit the road to California and entered Hollywood blvd. with my new vows, finding immediate success as an activist serving others, instead of an entertainer just serving self.

along. I saw people thriving who would be dying and in prison in Texas. I had to help Texans get this peace and prosperity. I came home, kissed the ground outside of the airport, and got out my sign that read "Will Rap 4 Weed".

Creating awareness to decriminalize began in Houston, TX. Getting the approval of Houston Mayor Annise Parker resulted in news coverage and a documentary by Rice University on my work. This media attention made the decriminalization policy I was promoting so popular that I was able to make it the platform for both DA's running for office, resulting in the current successful decriminalization of Harris County.

Seeing activism works, I moved to Dallas to decriminalize, which took 3 1/2 years. During this time I enrolled at Oaksterdam University learned everything about cannabis, earning valedictorian of my class.

After a decade of living in the Texas Legislative Process, and studying the political climate, I see an opportunity to legalize in 2018 and fine tune Texas to be how the majority of Texans want Us to be. I know one person can really change a law or policy.

Be the first to know with the Crossroadstoday.com news app. Breaking news alerts, watch live newscasts and get the most up-to-date local news on the go. Click here to download for iOS https://goo.gl/xmcho6 and Android https://goo.gl/16iH5K.

All content © Copyright 2000 - 2017 Frankly Media and crossroads. All Rights Reserved. For more information on this site, please read our Privacy Policy, Terms of Service, Ad Choices

Inspection
Files -
KAVU
| FCC
Public
Inspection
Files -
KVCT.

Exhibit
17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVETTE GBALAZEH, on behalf of herself and all others similarly situated, | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | CIV. CASE NO. 3:18-cv-00076-N |
| CITY OF DALLAS, TEXAS, a municipality of the State of Texas, | § § § | |
| Defendant. | § § | |

**UNSWORN DECLARATION OF
LEE SUNBURY**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1. My name is Lee Sunbury. I make this declaration pursuant to 28 U.S.C. § 1746 and Section 132.001 of the Texas Civil Practice and Remedies Code. I am above the age of 18, of sound mind, and competent to make this Declaration. All facts stated herein are within my personal knowledge and are true and correct.

2. I am a resident of Dallas County. I have lived in the City of Dallas since December 2014. I moved here from Palm Beach, Florida for a job I had with the Bush Brother furniture manufactures. The guy I was working for, unfortunately, went bankrupt. He sent me money to return via Western Union, but I was jumped in Pleasant Grove for the money. They took everything from me, including my phone, my wallet, my social security card, my birth certificate, my identification card, basically everything I had in my possession. I was

hospitalized, and upon my release was provided a taxi ride to the Bridge, a local homeless shelter. That's when my life of panhandling started.

3.   I started panhandling in Dallas in early 2015. I've had various odd jobs since, but panhandling has been the most consistent thing I've done for money since. I have panhandled all over the city, and recently have taken up panhandling at a spot on the corner of I-45 and Lamar. On a typical day of panhandling, I receive about fifty dollars. Thirty dollars is a bad day, and seventy dollars, which has happened on more than one occasion, is a really good day. Once, I received five hundred dollars from a Hispanic gentleman, driving a small Nissan pick-up truck, who gave it to me an envelope. It was a blessing. Not sure who they were, but I was thankful. The worst days; however, are the days when I get arrested when I'm trying to earn my living.

4.   I have been arrested five (5) times for panhandling. I was arrested for the first time in 2015. Below is a description of the arrests and the result of each case. On information and belief, the following table is an accurate summary of my arrests as a result of panhandling, including the date, the ordinance I was charged with violating, the dollar amount which I was credited by the City for the amount of time I spent in jail during each arrest, the number of days I spent in jail, and the ultimate resulting outcome from each arrest:

| Date of Arrest | Ordinance Violated | Plea | Credit | Detention | Result |
|---|---|---|---|---|---|
| 2/28/18 | 28-63 | Not Guilty | Unpaid fine of $401 | None | Alias Warrant issued. |
| 10/19/15 | 28-63 | No Contest | $511.80 | 3 days | Docket Closed. |
| 10/12/15 | 28-63 | No Contest | Unpaid balance of $400 | 24 hours | Community Court. Alias Warrant Issued |
| 6/19/15 | 28-63 | No Contest | $492.30 | 24-48 hours | Docket Closed. |
| 2/8/15 | 28-63 | No Contest | $492.30 | 24-48 hours | Docket Closed. |

5.   Each time I was arrested, I was transported to the Dallas County Jail on Riverside. I typically spent one or two nights in jail waiting to see the judge. On some occasions, it took up to three days or longer because of the number of people that were in jail with me for the same crime.

6.   Each time I was arrested, there were so many people that it looked like a cattle call. They moved us through processing several people at a time, often conducting roll calls to keep track of the large mass of people. Looking around the room, I noticed that many of people in the cell with me looked like me. They had tattered or old clothing, old, beat-up shoes, dirty hair, dirty appearance and some smelled more than others.

7.   We were fed a bologna sandwich twice a day. We were not provided anything to sleep on. They refused to provide us additional garments or blankets, and the cell was kept at a very cold temperature. It is a miserable experience. Often times, I eat better food on the streets with the money I make from panhandling, and my sleeping situation is far better out on the streets than it was in that cell. All I could think about was being released.

8.   When I saw the judge, I was informed of my right to plea guilty, no contest, or not guilty. I was told that if I plead guilty or no contest, my fine would be paid with time served in jail, and that I would be released immediately. A plea of not guilty might mean that I would have to stay in that cell longer. More often than not, to avoid having to sit in jail any longer, I plead no contest.

9.   My   date   of   birth   is   _7/20/67_  .   My   address   is _45/ LAMAR_____. I declare under penalty of perjury that the foregoing is true and correct.

Unsworn Declaration of Lee Sunbury                                          Page 3 of 4

Executed at Dallas, Dallas County, Texas, on this 8 th day of May, 2018:

Declarant, Lee Sunbury

###END OF DOCUMENT###

# Exhibit 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVETTE GBALAZEH, on behalf of herself and all others similarly situated, | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIV. CASE NO. 3:18-cv-00076-N |
| CITY OF DALLAS, TEXAS, a municipality of the State of Texas, | § § § | |
| Defendant. | § § § | |

### UNSWORN DECLARATION OF
### FRED SIMS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1. My name is Fred Sims. I make this declaration pursuant to 28 U.S.C. § 1746 and Section 132.001 of the Texas Civil Practice and Remedies Code. I am above the age of 18, of sound mind, and competent to make this Declaration. All facts stated herein are within my personal knowledge and are true and correct.

2. I am a resident of Dallas County. I have lived in the City of Dallas for twenty plus years. I moved here from Houston, Texas, after attending college in Tyler, Texas at Tyler Junior College where I studied petroleum technology. After completing two years, I moved to Dallas, over in Oak Cliff, with a cousin of mine. I lived with her until she passed in 2016.

3. About 12 to 15 years ago, I started drinking heavily and had some problems with drug use. I felt like I was in a rot. I lost my job as a result, but really I left the job because I no longer

had a desire to go. I couldn't be responsible. The worse it got, the harder it was for me to pull out of this downward spiral I was in. That's when I started panhandling.

4. I started panhandling in Dallas around 2007. I have panhandled all over the city, and recently have taken up panhandling at a spot on the corner of I-45 and Lamar. On a typical day of panhandling, I receive about fifty dollars. Thirty dollars is a bad day, and seventy dollars, which has happened on more than one occasion, is a really good day. The worst days are the days when I get arrested when I'm trying to earn my living.

5. I have been arrested thirteen (13) times for panhandling. I was arrested for the first time in 2007. On information and belief, the following table is an accurate summary of my arrests as a result of panhandling, including the date, the ordinance I was charged with violating, the dollar amount which I was credited by the City for the amount of time I spent in jail during each arrest, the number of days I spent in jail, and the ultimate resulting outcome from each arrest:

| Date of Arrest | Ordinance Violated | Plea | Credit | Detention | Result |
|---|---|---|---|---|---|
| 7/23/16 | 28-63 | No Contest | Unpaid fine of $300 | 24 hours. | Community Court. Alias Warrant Issued. |
| 6/20/16 | 28-63 | Not Guilty | Unpaid fine of $401 | 48-72 hours. | Community Court. Alias Warrant Issued. |
| 1/14/16 | 28-63 | No Contest | $560.30 | 48-72 hours. | Docket Closed. |
| 12/20/15 | 28-63 | No Contest | $560.30 | 48-72 hours. | Docket Closed. |
| 7/4/15 | 28-63 | No Contest | $560.30 | 48-72 hours. | Docket Closed. |
| 7/26/14 | 28-63 | No Contest | $336 | 48-72 hours. | Docket Closed. |
| 7/17/14 | 28-63 | No Contest | $545.30 | 48-72 hours. | Docket Closed. |
| 7/11/14 | 28-63 | No Contest | $336 | 48-72 hours. | Docket Closed. |

| 4/18/13 | 28-63 | No Contest | Unpaid fine of $447.20 | 48-72 hours. | Community Court. Alias Warrant Issued. |
|---------|-------|------------|------------------------|--------------|----------------------------------------|
| 3/23/11 | 28-63 | No Contest | Paid $30 | 48-72 hours. | Docket Closed. |
| 6/9/08 | 31-35 | No Contest | Paid $30 | 48-72 hours. | Dismissed for want of prosecution. |
| 5/17/08 | 28-63 | No Contest | $264 | 48-72 hours. | Docket Closed. |
| 9/12/07 | 31-35 | No Contest | $262 | 48-72 hours. | Docket Closed |

6. Each time I was arrested, I was transported to the Dallas County Jail on Riverside. I typically spent two or three nights in jail waiting to see the judge. On some occasions, it took up to three days or longer because of the number of people that were in jail with me for the same crime.

7. Each time I was arrested, there were so many people that it looked like a cattle call. They moved us through processing several people at a time, often conducting roll calls to keep track of the large mass of people. Looking around the room, I noticed that many of people in the cell with me looked like me. They had tattered or old clothing, old, beat-up shoes, dirty hair, dirty appearance and some smelled more than others.

8. We were fed a bologna sandwich twice a day. We were not provided anything to sleep on. They refused to provide us additional garments or blankets, and the cell was kept at a very cold temperature. It is a miserable experience. Often times, I eat better food on the streets with the money I make from panhandling, and my sleeping situation is far better out on the streets than it was in that cell. All I could think about was being released.

9. When I saw the judge, I was informed of my right to plea guilty, no contest, or not guilty. I was told that if I plead guilty or no contest, my fine would be paid with time served in

jail, and that I would be released immediately. A plea of not guilty meant that I would have to stay in that cell longer. More often than not, to avoid having to sit in jail any longer, I plead no contest.

10. My date of birth is _12/11/1960_ My address is _I45/Lamar_ . I declare under penalty of perjury that the foregoing is true and correct.


Executed at Dallas, Dallas County, Texas, on this _6_th day of May, 2018:

_Fred Sims_

Declarant, Fred Sims


###END OF DOCUMENT###

Exhibit
19

# Memorandum



CITY OF DALLAS

DATE   December 29, 2017

TO   Honorable Mayor and Members of the City Council

SUBJECT   **Panhandling and Solicitation Enforcement**

There have been some inaccurate media reports regarding the Dallas Police Department's enforcement of solicitation offenses.  There has not been an official memorandum or training bulletin issued by the Dallas Police Department instructing officers not to issue citations for solicitation.

Currently, officers continue to respond to solicitation-related complaints through the enforcement of Dallas City Code § 28-63.3 and Texas Transportation Code § 552.007, which prohibit solicitation by pedestrians on public roadways.  Additionally, officers enforce a variety of other laws when aggressive solicitors engage in conduct that poses a threat to public health or public safety.  These laws include Texas Penal Code § 22.07 (terroristic threats); Texas Penal Code § 22.01(a)(1) (assault); Texas Penal Code § 22.01(a)(2) (assault by threat); Texas Penal Code § 42 (disorderly conduct); and Dallas City Code § 7A (littering).

In addition, please find attached the Dallas Police Department's training bulletin on solicitation, which will be distributed to all Dallas Police Department officers.

Kimberly Bizor Tolbert
Chief of Staff to the City Manager

[Attachment]

cc:   T.C. Broadnax, City Manager
Larry Casto, City Attorney
Craig D. Kinton, City Auditor
Bilierae Johnson, City Secretary (Interim)
Daniel F. Solis, Administrative Judge
Majed A. Al-Ghafry, Assistant City Manager

Jo M. (Jody) Puckett, Assistant City Manager (Interim)
Jon Fortune, Assistant City Manager
Joey Zapata, Assistant City Manager
M. Elizabeth Reich, Chief Financial Officer
Nadia Chandler Hardy, Chief of Community Services
Raquel Favela, Chief of Economic Development & Neighborhood Services
Theresa O'Donnell, Chief of Resilience
Directors and Assistant Directors

"Our Product is Service"
Empathy | Ethics | Excellence | Equity

# ROLL CALL

# TRAINING BULLETIN

# #2017 – 18



Date: 12-29-2017                                          Document Control # 40-17

When solicitation on or adjacent to a roadway presents a public safety concern, a Dallas Police Department officer may enforce and cite the following laws:

## DALLAS CITY CODE SEC. 28-63.3.  SOLICITATIONS TO OCCUPANTS OF VEHICLES ON PUBLIC ROADWAYS PROHIBITED.

A person commits an offense if, while occupying any public property adjacent to any public roadway in the city, he knowingly conducts a solicitation directed to, or intended to attract the attention of, the occupant of any vehicle stopped or traveling on the roadway.  An offense occurs when the solicitation is made, whether or not an actual employment relationship is created, a transaction is completed, or an exchange of money, goods, or services takes place.

(c)  It is a defense to prosecution under Subsection (b) that the person was:

(1)  summoning aid or requesting assistance in an emergency situation; or

(2)  a law enforcement officer in the performance of official duties.

(d)  In addition to any enforcement action by a peace officer for a violation of this section, any person who is a victim of a solicitation prohibited under Subsection (b), or who witnesses a violation of Subsection (b), may file a complaint with the city attorney. Evidence to support a conviction for a violation of this section may include, but is not limited to, testimony of witnesses, videotape evidence of the violation, and other admissible evidence.  (Ord. 25213)

## TEXAS TRANSPORTATION CODE § 552.007. SOLICITATION BY PEDESTRIANS.

(a)    A person may not stand in a roadway to solicit a ride, contribution, employment, or business from an occupant of a vehicle, except that a person may stand in a roadway to solicit a charitable contribution if authorized to do so by the local authority having jurisdiction over the roadway.

(b)    A person may not stand on or near a highway to solicit the watching or guarding of a vehicle parked or to be parked on the highway.

(c)    In this section, "charitable contribution" means a contribution to an organization defined as charitable by the standards of the United States Internal Revenue Service.

Acts 1995, 74th Leg., ch. 165, § 1, eff. Sept. 1, 1995.

If you have any questions, please contact Assistant Chief Angela Shaw at 214-671-3939.

Exhibit
20




**O11 / 21 CBS DFW**   ☰ MENU   NEWS   WEATHER   SPORTS   VIDEO   BEST   CBS 11 News ON AIR   S⋅

# DPD Chief Seeks To Clear-Up Confusion Over Anti-Panhandling Ordinance

By Jack Fink    January 8, 2018 at 7:50 pm    **Filed Under:**  City Of Dallas,  City Ordinance,  dallas police,  Local TV,  panhandler,  panhandling,  panhandling ordinance

Enforcement Of Anti-Panhandling Ordinance B
Questioned In Dallas

**DALLAS (CBS11)** – Dallas Police Chief U. Renee Hall sought to clear up any confusion about her department's enforcement of the city's anti-panhandling ordinance.

Hall told reporters Monday, "We are in no way stepping back from our responsibility."

Earlier, she told the public safety committee that they're having their officers continue targeting panhandlers in the streets or on sidewalks who ask drivers for money.

## FOLLOW US

## OUR NEWSLETTER

✉ Sign up and get our latest headlines delivered right to your inbox!

Email address

Subscribe Now!

## MOST VIEWED

1  'He's Dead, Please Don't Shoot Me': Body Cam Video From Teen Shooting Shown At Former Texas Officer's Trial ⊡

2  Greyhound Passengers Stranded In Dallas, Employee 'Beat Up' After Bus Wheel Fire ⊡

But the department is de-emphasizing another part the ordinance which targets panhandlers in special zones the city established, such as store parking lots and around ATMs in downtown, Uptown and Deep Ellum.

Chief Hall told council members, "We have to work with legal to figure out if those zones are actually enforceable."

Chief Hall says for now, there are questions about these zones, because other cities with similar ordinances as Dallas have lost legal challenges after the courts have found the act of panhandling itself is not illegal, and protected by the First Amendment.


panhandling in Dallas (CBS11)

Council members told her they weren't happy because they read about the change in the Dallas Morning News.

Councilman Philip Kingston told Hall, "I do think this is a major change in enforcement policy. The September 20 briefing did not include an immediate change in policy and there was not a warning in December there would be some change. I didn't particularly appreciate that."

Chief Hall responded by saying, "It is not our intention to disrespect this body or the council as a whole."

Councilman Adam McGough, the chairman of the Public Safety Committee, said, "It's not hard to get in touch with us. I don't want to read about it in the paper, just let us know."

The President of the Dallas Police Association, Mike Mata, says his members are still unclear about the department's policy. "I think the more questions are those parking lots, those ATMs, those grocery store parking lots. Could you get an offense of criminal trespass Absolutely, but you'd have to have a complainant and the complainant would have to b the store owner."

Chief Hall said the police will still prosecute aggressive panhandlers who threaten or assault people.

3 Missing University Of Iowa Student Mollie Tibbetts Found Dead ▶

4 'I Kissed My Wife Goodbye': Victim Shares Story Of Terrifying Armed Robbery In Fort Worth ▶

5 Baby Stabbed To Death In Lewisville Identified; Police To Charge Father ▶

6 Police: Father Yelled 'Jesus Is Coming' Before Fatally Stabbing 16-Month-Old Son ▶

7 Texas Deputy Accused Of Child Rape Dies In Apparent Suicide ▶

8 2 Arrested In Attack On Texas Woman With $75,000 In Her Purse ▶

9 Post Malone's Plane To Make Emergency Landing After 2 Blown Tires ▶

10 Dallas Police Chase Ends With Fiery Crash Involving 5 Vehicles ▶

Charitable organizations are exempt from the panhandling ordinance, but they must register with the city.

**Jack Fink**

Follow @CBS11Jack

Jack covers politics for KTVT-TV CBS 11 and has been with the station since September 2003. This year, he has interviewed Democrat Bernie Sanders and...

**More from** Jack Fink

Sponsored Links

Texas: Say Goodbye To Your Mortgage If You Have No Missed Payments

Mortgage Quotes | Fetcharate

Why Millennials are "Ghosting Amazon"

Wikibuy

Chunking Chip Shots? You Need This Straight Back Wedge

Square Strike Wedge Golf

Ergonomic Office Chair. All Black Color.

$299 - autonomous.ai

Sonatina Tassel Earrings - $36

$36 - baublebar.com

Austin, Texas: This Unbelievable, Tiny Company Is Disrupting a $200 Billion Industry

EverQuote Insurance Quotes

**Police: Man Admits Killing Another After Stealing His Cell Phone And Wallet**
Police have arrested a man who they say shot and killed another man after stealing his wallet and phone.

**Mother, Son Die After Rescuers Pull Them From Lake Grapevine**
A mother and son who were pulled out of Lake Grapevine last week have died.

Sponsored Links by Taboola

Enter Your Name, Wait 11 Seconds, Brace Yourself

TruthFinder

Everyday Golfers Are Using This Driver to (Finally) Win

GX7 Golf

# ◉ CBS DFW

Follow Us

## NEWS

Latest Headlines
Video
Photo Galleries
Share Photos
Links & Numbers

## SPORTS

Latest Headlines
CBS Local Sports
The Landry Award
DFW Outdoorsman
Pro Shop

## WEATHER

Current Conditions
Live Radar
Weather App
Share Photos
Mobile 11

## BEST OF

Latest Posts
Eat · See · Play
Fresh Grocer
Community Events
Plugged In To DFW

## STATIONS

About CBS 11
About TXA 21
TV Schedules
Contests
Contact Us

## CORPORATE

Only CBS
Watch CBSN
CBS Local App
Advertise
Career Info
CBS TV Public File

©2018 CBS Broadcasting Inc. All Rights Reserved.
Powered by WordPress.com VIP

By viewing our video content, you are accepting the terms of our Video Services Policy
Terms Of Use    Mobile User Agreement    Privacy Policy (Updated 5/24/18)    Your California Privacy
Rights    Ad Choices    EEO Report

Exhibit
21

# ROLL CALL

# TRAINING BULLETIN

# #2018 – 03



---

Date: 02-08-2018                    Document Control # Pending

---

**This Roll Call Training Bulletin updates and supersedes previously issued RCTB #2017-18**

**At this time, and until further notice, a Dallas Police Department officer shall not enforce or cite solicitation under Dallas City Code Section 31-35, "Solicitation by Coercion; Solicitation Near Designated Locations and Facilities; Solicitation After Sunset; Solicitation-Free Zones," of the Dallas City Code.**

A Dallas Police Department officer may enforce and cite solicitation to occupants of vehicles on public roadways under the following law:

## DALLAS CITY CODE SEC. 28-63.3.   SOLICITATIONS TO OCCUPANTS OF VEHICLES ON PUBLIC ROADWAYS PROHIBITED.

A person commits an offense if, while occupying any public property adjacent to any public roadway in the city, he knowingly conducts a solicitation directed to, or intended to attract the attention of, the occupant of any vehicle stopped or traveling on the roadway.  An offense occurs when the solicitation is made, whether or not an actual employment relationship is created, a transaction is completed, or an exchange of money, goods, or services takes place.

(c)   It is a defense to prosecution under Subsection (b) that the person was:

(1)   summoning aid or requesting assistance in an emergency situation; or

(2)   a law enforcement officer in the performance of official duties.

(d)   In addition to any enforcement action by a peace officer for a violation of this section, any person who is a victim of a solicitation prohibited under Subsection (b), or who witnesses a violation of Subsection (b), may file a complaint with the city attorney.  Evidence to support a conviction for a violation of this section may include, but is not limited to, testimony of witnesses, videotape evidence of the violation, and other admissible evidence.  (Ord. 25213)

In addition to the above law, a Dallas Police Department officer may enforce a variety of other laws separate from the solicitation itself, such as assault by threat (Texas Penal Code § 22.01(a)(2)), assault (Texas Penal Code § 22.01(a)(1)), disorderly conduct (Texas Penal Code § 42) and littering (Dallas City Code § 7A).

If you have any questions, please contact the Criminal Law & Police Unit 214-671-3430.